## STATE OF CONNECTICUT *v.* DAVID BJORKLUND
### (AC 23135)

Schaller, Flynn and Dupont, Js.

Argued February 14—officially released September 23, 2003

*Adele V. Patterson*, assistant public defender, for the appellant (defendant).

*Harry Weller*, assistant state's attorney, with whom were *Robin S. Schwartz*, former deputy assistant state's attorney, and, on the brief, *Scott J. Murphy*, state's attorney, and *Kevin J. Murphy*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, David Bjorklund, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (1), assault of a victim sixty years of age or older in the first degree in violation of General Statutes § 53a-59a, and two counts

of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1) and (3).[1] On appeal, the defendant claims that (1) his arrest and later detention violated article first, § 9, of the constitution of Connecticut, (2) the state failed to prove that he intelligently and voluntarily waived his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), (3) his statements made to the police were involuntary, (4) the life sentences to which he was exposed as a result of his conviction of robbery in the first degree and assault of a victim sixty years of age or older in the first degree violated article first, § 8, of the constitution of Connecticut because he was not afforded a probable cause hearing, (5) the verdict on the charges of assault of a victim sixty years of age or older in the first degree and reckless indifference manslaughter was mutually inconsistent with the verdict on the charges of intentional manslaughter and robbery in the first degree, and (6) the trial court improperly admitted into evidence the probable cause hearing testimony of an unavailable witness. We affirm the judgment of the trial court in part and reverse it in part.

The jury reasonably could have found the following facts. During the afternoon of August 26, 1998, the defendant was at the apartment of Karen Barile on Belden Street in New Britain. At approximately 4:30 p.m., the defendant and Barile walked to a local store to purchase cigarettes, alcohol and ice cream. They returned to the front of Barile's apartment complex about one hour later, but they did not enter. Soon thereafter, Barile left to go to Hartford to purchase cocaine for herself and the defendant.

When Barile left, the defendant walked to Marty's Cafe, a nearby bar. On the way to Marty's Cafe, the

---

[1] At sentencing, the trial court merged the conviction of the two manslaughter charges into the conviction of felony murder.

defendant stopped at the rear of Roosevelt School and hid a forty ounce bottle of beer and several bottles of Specialty Brew in the bushes. He took two bottles of Specialty Brew with him to Marty's Cafe, hiding them in his pockets. Upon arriving at Marty's Cafe, the defendant ordered beer and sat at one of the tables. After finishing the beer, the defendant asked for a glass of water. Upon receiving the water, the defendant went into the bathroom, where he disposed of the water and filled his glass with the alcohol that he had brought with him. After finishing that drink at the table, the defendant returned to the bathroom and filled his glass with the second bottle of alcohol that he had brought. The defendant sat at a table and was approached by the bartender. The bartender, upon seeing the bottle of alcohol that the defendant had, took the bottle. The defendant went to the bar and asked for a drink, which the bartender did not serve because the defendant was intoxicated and belligerent. The defendant left the bar at approximately 7 p.m.

While outside, the defendant approached the victim, Maurice Bolduc. After a short conversation, the two proceeded to walk toward Roosevelt School. While behind Roosevelt School, the defendant attacked the victim, kicking his head and torso multiple times. The defendant also took the victim's wallet. The victim died the following day at New Britain General Hospital.

The defendant was arrested on August 27, 1998, on a violation of probation warrant. While being questioned, the defendant confessed to assaulting and robbing the victim, and was arrested on the charges underlying this appeal. Following a jury trial, the defendant was convicted on all five counts. This appeal followed.

I

The defendant first claims that his arrest and subsequent detention violated article first, § 9, of the constitu-

tion of Connecticut. Specifically, the defendant claims that his arrest was not "clearly warranted by law" because the warrant issued for his arrest for violating the terms of his probation was "a sham arranged to further the homicide investigation." Accordingly, the defendant argues that the court should have suppressed the statements he gave to the police and the physical evidence that resulted from his detention when he was arrested on the violation of probation warrant on August 27, 1998.

The following additional facts are relevant to our resolution of that issue. Prior to trial, the defendant filed a motion to suppress the statements that he made while in police custody and any physical evidence that resulted from those statements. At the hearing on the motion to suppress, Craig J. Hanson, the defendant's probation officer, testified. Hanson had sought a warrant for the defendant's arrest on August 27, 1998, after he received a telephone call from an inspector with the office of the state's attorney. The inspector requested that Hanson seek an arrest warrant for the defendant as a result of drug charges that had been filed against him on August 12, 1998. Hanson swore out the arrest warrant, stating in the affidavit that the defendant had "violated the condition of his probation which directs 'Do not violate any criminal law of this state, the United States or any other state.'" A judge of the Superior Court then signed the warrant, and the defendant was arrested.

The court denied the defendant's motion to suppress, crediting the testimony of Hanson that he properly had exercised his discretion in obtaining the warrant. Having found that the defendant did not make the preliminary showing required under *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), to allow a subfacial challenge to the warrant, the court considered the four corners of the warrant and ruled

that the defendant "wholly failed to present any evidence to show that Hanson . . . intentionally or recklessly misled the court into signing the warrant" and found that there was "more than ample probable cause" to issue the warrant. Additionally, relying on *Whren* v. *United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996), the court found that the subjective motives of Hanson were not relevant to the determination of the validity of the warrant.

The defendant now challenges the court's decision, claiming that his arrest for violation of probation was not "clearly warranted by law," as required by article first, § 9, because Hanson sought the warrant solely because of the request he received from the investigator. We disagree.

"Article first, § 9, provides: 'No person shall be arrested, detained or punished, except in cases clearly warranted by law.' " *State* v. *Mikolinski*, 256 Conn. 543, 555, 775 A.2d 274 (2001). "[W]e have generally characterized article first, § 9, as one of our state constitutional provisions guaranteeing due process of law." (Internal quotation marks omitted.) Id.

"[T]he specific content appropriately to be assigned to the phrase 'clearly warranted by law' depends on the particular liberty interest that is at stake." *State* v. *Lamme*, 216 Conn. 172, 178, 579 A.2d 484 (1990). "[Our Supreme Court has] stated that [t]he historical roots of except in cases clearly warranted by law appear . . . to provide protection for personal freedom through a blend of statutory and constitutional rights that, like the text of . . . article first, § 9, incorporates no single constitutional standard." (Internal quotation marks omitted.) *State* v. *Mikolinski*, supra, 256 Conn. 555–56.

Accordingly, our first task is to identify the particular liberty interest at stake. See id., 556. In this case, the claimed personal liberty interest at stake is the defen-

dant's right to be free from an arrest and detention for a violation of a condition of his probation. General Statutes § 53a-32 (a) provides in relevant part: "At any time during the period of probation . . . the court or any judge thereof may issue a warrant for the arrest of a defendant for violation of any of the conditions of probation . . . ." The defendant does not contest that he was on probation or that he violated the terms of his probation. Rather, the defendant claims that he was arrested on the violation of probation warrant solely as a pretext to permit the police to question him about the homicide.

The warrant affidavit clearly stated that the defendant was placed on probation on January 29, 1998, and that on August 12, 1998, he was arrested on drug charges, thereby violating a term of his probation. The defendant now asks us to look beyond the terms of the warrant and the duty of a probation officer to keep informed of a probationer's conduct. General Statutes § 54-108. He asks us to delve into other reasons *why* Hanson sought to obtain a warrant for the defendant's arrest for violating the terms of the probation.

The court, crediting the uncontroverted testimony of Hanson, denied the defendant's motion to suppress. Hanson testified that an inspector with the office of the state's attorney had made a request to have the defendant arrested for violating probation as a result of the defendant's arrest on drug charges on August 12, 1998. When asked whose decision it was to swear out the warrant, Hanson stated that it was his decision and that the inspector cannot order a probation officer to arrest a probationer for violation of probation. "The credibility of witnesses is a matter to be resolved solely by the [trier of fact]." (Internal quotation marks omitted.) *State* v. *White*, 229 Conn. 125, 143, 640 A.2d 572 (1994). "[W]e must defer to the [trier's] assessment of the credibility of the witnesses based on its firsthand

observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) Id.

The court rejected a subfacial challenge to the warrant, finding that the defendant had failed to show that Hanson intentionally or recklessly misled the court. "In order for a defendant to challenge the truthfulness of an affidavit underlying a warrant at a *Franks* hearing, he must: (1) make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit; and (2) show that the allegedly false statement is necessary to a finding of probable cause." (Internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 363, 796 A.2d 1118 (2002).

The defendant claims that had the judge who issued the warrant been aware of the fact that the reason Hanson obtained the warrant was to assist the police in their homicide investigation of the defendant, the judge would not have found probable cause to issue the warrant for arrest. "Not all omissions, however, even if intentional, will invalidate an affidavit. . . . Thus, before a defendant is entitled to a *Franks* hearing for an alleged omission, he must make a substantial preliminary showing that the information was (1) omitted with intent to make, or in reckless disregard of whether it made, the affidavit misleading to the issuing judge, and (2) material to the determination of probable cause." (Citations omitted; internal quotation marks omitted.) *State* v. *Bergin*, 214 Conn. 657, 666–67, 574 A.2d 164 (1990).

The court properly found that the defendant had failed to make the preliminary showing necessary to be entitled to a *Franks* hearing. Hanson testified that it was his decision to obtain a warrant for the defendant's arrest on the charge of violation of probation. The court

credited Hanson's testimony. The defendant failed to put forth any evidence to establish his claim that the only reason the warrant was obtained was as a pretext to question him about the homicide.

Because the defendant did not meet the prerequisites for the court to hold a *Franks* hearing, we will not look beyond the warrant to determine whether probable cause existed to find that he had violated the terms of his probation. The warrant document clearly established that probable cause existed to arrest the defendant pursuant to § 53a-32. Accordingly, the defendant's rights under article first, § 9, were not violated. The defendant's arrest was "clearly warranted by law," and the evidence obtained therefrom was admitted into evidence properly.

The defendant also claims that his detention on August 28, 1998, was "not clearly warranted by law" under article first, § 9, and that the resulting statement he gave the police should have been suppressed. The defendant relies primarily on *State* v. *White*, supra, 229 Conn. 125. In *White*, a witness identified the defendant in a photographic array on two occasions. Id., 129. On each occasion, however, the witness stated that he "had a slight doubt" that the defendant was the perpetrator and wanted to view the defendant in person to be positive about the identification. Id. The defendant, who was being held at the Bridgeport correctional center on unrelated charges, was transported, pursuant to a document titled, "Motion for Order of Temporary Removal," to the Bridgeport police station for a lineup. Id., 147. While at the police station, the defendant was placed in a lineup and was identified by the witness as the perpetrator. Id., 129.

On appeal, the defendant claimed that the identification should have been suppressed because the temporary removal was illegal. Id., 148. In holding that the

defendant's detention for the lineup was not "warranted by law," our Supreme Court stated: "We have long held that [p]resentenced detainees have all the constitutional rights of members of society except those incident to their custody for safekeeping prior to judgment. . . . Under our state constitution, this includes the right not to be compelled to participate in police investigatory procedures unless clearly warranted by law." (Citation omitted; internal quotation marks omitted.) Id., 154.

Assuming without deciding that *White* is applicable in this case, the court properly denied the defendant's motion to suppress the statement that he provided to the police on the morning of August 28, 1998. In *State v. Rogers*, 143 Conn. 167, 170–71, 120 A.2d 409, cert. denied, 351 U.S. 952, 76 S. Ct. 850, 100 L. Ed. 1476 (1956), our Supreme Court held that a defendant's removal from jail to be questioned at the state's attorney's office on an unrelated robbery and murder was illegal. The court held that "[p]roper court authorization should have been secured before the defendant was removed from the jail." Id., 173–74. Our Supreme Court, however, did not suppress the defendant's subsequent statement made after the illegal detention. The court held that the question to be determined was whether the detention had "induced the defendant to make an involuntary and hence untrue statement." Id., 174.

The facts in this case do not lead us to conclude that the defendant's statement was affected or coerced by his detention on the morning of August 28, 1998. Prior to being questioned, Detective Michael Baden began to inform the defendant of his *Miranda* rights. As he had done the night before, the defendant interrupted Baden, and stated that he knew what his rights were and that

he was willing to waive those rights and to speak to Baden. The defendant then voluntarily gave a statement to Baden. See parts II and III. Accordingly, under the facts of this case, where the defendant knew his rights under *Miranda* and affirmatively stated that he wanted to waive those rights and to provide a statement to the police, we conclude that it was not improper for the court to deny the defendant's motion to suppress the statement that he provided to Baden on August 28, 1998.

II

The defendant next claims that the state failed to prove that he intelligently and voluntarily waived his *Miranda* rights. Specifically, the defendant claims that he did not (1) understand that he had a right to counsel during questioning and (2) voluntarily waive his *Miranda* rights. We disagree.

The following facts are relevant to our resolution of that issue. At approximately 3:30 p.m. on August 27, 1998, the defendant was arrested on a warrant for violating his probation. Upon his arrest, the defendant was transported to the detective bureau of the New Britain police department. At approximately 4:40 p.m., Baden began to interview the defendant. Baden told the defendant that he was under arrest and began to inform him of his *Miranda* rights. As Baden recited the *Miranda* rights to the defendant, the defendant stopped Baden and stated that "he was well aware of what his rights were." Baden again attempted to inform the defendant of his *Miranda* rights, and the defendant stated that "he had been through the system before, he knew what his rights were, and then he immediately proceeded to explain to [Baden] what his rights were." After the

defendant recited what his rights were, he indicated that he was willing to waive those rights and to speak to Baden. The defendant, however, did not want to sign a waiver of rights form at that time. The defendant then gave a written statement to Baden, stating that he and the victim had engaged in an altercation over alcohol. After reviewing his statement, the defendant signed it and then agreed to sign a waiver of rights form. At approximately 11 p.m., the defendant was booked on the violation of probation charge and placed in the lockup for the evening.

The next morning, August 28, 1998, at approximately 8 a.m., the defendant was removed from the lockup and returned to the interview room in the detective bureau. Baden again attempted to inform the defendant of his *Miranda* rights. The defendant, as he did the previous day, interrupted Baden's recitation of his rights and said that he was "well aware of his rights." Baden did not the ask the defendant to describe what his rights were this time "because he made it clear to [him] the prior evening that he was aware, in fact, of what his rights were." The defendant stated that he was willing to waive his rights and to speak to Baden. After interviewing the defendant, Baden asked the defendant if he would give a written statement. The defendant agreed to do so. After Baden advised the defendant of his rights and the defendant signed a form acknowledging those rights, the defendant gave a written statement to Baden. The defendant subsequently was arrested at approximately 1 p.m. on charges of felony murder and assault in the first degree in violation of General Statutes § 53a-59 (a) (3). See footnote 3.

Prior to trial, the defendant filed a motion to suppress the statements that he gave on August 27 and 28, 1998, claiming that they were given in violation of his *Miranda* rights. Following a hearing, the court denied the defendant's motion.

A

Before we address the defendant's first claim, we note that the defendant does not claim that the warnings were inadequate because he, rather than the detective, had recited the *Miranda* warnings. The defendant contends that the rights that he recited did not accurately reflect the protections that he is entitled to under *Miranda*. Accordingly, the defendant's claim turns on whether the defendant properly understood the rights afforded to him under *Miranda*.

"At the outset, we set forth the standard of review. Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Luurtsema*, 262 Conn. 179, 184, 811 A.2d 223 (2002). The issue before us is whether the court properly found that the defendant understood that he had the right to counsel before and during questioning by the police.

At the suppression hearing, Baden, who was the only witness to testify about the *Miranda* warnings, testified that prior to the defendant giving his statement on August 27, 1998, the defendant "told me that he knew he had the right to remain silent; that he knew he had the right to have an attorney present; he knew that if he spoke to the police, anything he said would be used against him in court; he knew that he had the right to stop answering questions at any time; and he knew that he had the rights—that the court would appoint an attorney for him if he could not afford one." When

asked whether his testimony was a direct quotation, Baden testified: "It's not a specific quotation, but those words—thereabouts." Baden, however, was sure that the defendant knew what his rights were under *Miranda*.

In denying the defendant's motion to suppress, the court, crediting the testimony of Baden, found that the police had attempted to administer the *Miranda* warnings to the defendant on August 27 and 28, 1998, and on both occasions, he interrupted the warnings and assured the police that he knew what his rights were. The court stated that it found "under the totality of all the circumstances presented here, that prior to his interrogation, the defendant was well aware of his *Miranda* rights, that he understood those rights, and he thereafter waived those rights."

At trial,[2] Baden, when questioned about the statement that the defendant provided on August 27, 1998, testified that the defendant "said that he knew he had the right to remain silent; that he knew anything that was said would be used against him; he knew he had the right to have an attorney and to have him present during the questioning; he knew that if he could not afford an attorney, one would be appointed for him; and he knew he could stop answering questions at any time that he wanted to."

The crux of the defendant's claim is that Baden's testimony was unreliable because when Baden testified at the suppression hearing, his recitation of what the defendant stated his rights were under *Miranda* did not include the phrase "before or during questioning" in association with his right to counsel, while at trial,

---

[2] "We may consider the testimony adduced both at the trial and at the suppression hearing when determining the propriety of the trial court's ruling on a motion to suppress a confession." (Internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 390 n.5, 736 A.2d 857 (1999).

Baden testified that the defendant had stated that he had a right to have an attorney present during questioning. Because of that inconsistency in Baden's testimony, the defendant contends, the state failed to establish that the defendant understood his rights under *Miranda*.

"It is the sole province of the trial court to assess the credibility of witnesses." *State* v. *Rodriguez*, 56 Conn. App. 117, 122, 741 A.2d 326 (1999), cert. denied, 252 Conn. 926, 746 A.2d 791 (2000). The court found that the defendant was aware of his rights under *Miranda*. The court's decision rested on the credibility of Baden's testimony. It is not our function to assess the credibility of witnesses. *State* v. *Castro*, 60 Conn. App. 78, 80, 758 A.2d 470, cert. denied, 255 Conn. 912, 763 A.2d 1038 (2000). Accordingly, it was proper for the court to credit the testimony of Baden that the defendant had recited his rights under *Miranda* properly. See *State* v. *Cabral*, 75 Conn. App. 304, 310, 815 A.2d 1234, cert. granted on other grounds, 264 Conn. 914, 826 A.2d 1158 (2003).

Additionally, our close review of the record supports the court's decision. Baden was the only witness to testify regarding the content of the defendant's recitation of the *Miranda* warnings. Baden was certain that the defendant understood the warnings. Accordingly, the court's ruling was supported by the facts in the record, and the court properly found that the defendant understood his *Miranda* rights.

## B

The defendant next claims that the state did not prove that he voluntarily waived his rights under *Miranda*. It is the defendant's contention that his waiver was involuntary because he did not understand his *Miranda* rights, he was subjected to the "oppressive atmosphere of dogged persistence"; *Miranda* v. *United States*, supra, 384 U.S. 451; the police lied to him and he suf-

fered from methadone withdrawal. We are not persuaded.

"In order to show that the defendant waived his privilege against self-incrimination, the state must prove by a preponderance of the evidence that he knowingly and intelligently waived his constitutional right to remain silent. . . . The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. . . . [T]he question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. . . . The issue of waiver is factual, but our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation." (Internal quotation marks omitted.) *State* v. *Jacques*, 53 Conn. App. 507, 514–15, 733 A.2d 242 (1999).

"The burden upon the state to prove a valid waiver of *Miranda* rights is proof by a fair preponderance of

the evidence and not proof beyond a reasonable doubt. . . . In considering the validity of this waiver, we look, as did the trial court, to the totality of the circumstances of the claimed waiver." (Citations omitted; internal quotation marks omitted.) *State* v. *Hafford*, 252 Conn. 274, 296, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000).

After a careful review of the evidence, we conclude that there was substantial evidence to support the court's factual findings and its conclusion that the defendant knowingly and intelligently had waived his *Miranda* rights. The court found that the defendant knew his rights under *Miranda*, the interrogation was not unreasonably long, he was offered food and drink, the police tactics were not improper and, when he gave his statements, he was not suffering from severe withdrawal from methadone.

As previously stated, the defendant knew his *Miranda* rights. After reciting the rights to Baden, the defendant indicated that he was willing to waive them and to give a statement. At no point did the defendant ask to speak to an attorney. Prior to giving his written statements, the defendant signed a form acknowledging that he had been advised of his rights.

On August 27, 1998, the defendant was questioned from 4:40 p.m. until approximately 8:20 p.m., when he began to give his written statement. On August 28, 1998, the defendant was questioned from approximately 8 a.m. until 10:42 a.m., when he began to give his second written statement. The duration of the questioning on either day was not unreasonably long. See *State* v. *Lapointe*, 237 Conn. 694, 733, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996).

The defendant's claim that the police lied to him when, during the questioning, they did not inform him that the victim had died, is without merit. A false repre-

sentation, or in this case, an omission, is not necessarily impermissible. Our Supreme Court has held that such statements "are common investigative techniques and would rarely, if ever, be sufficient to overbear the defendant's will and to bring about a confession to a serious crime that is not freely self-determined . . . ." (Internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 423, 736 A.2d 857 (1999). None of the tactics used by the police in questioning the defendant lead us to conclude that his waiver of his rights was involuntary.

Finally, the court's finding that the defendant was not going through withdrawal from methadone when he gave his two statements was supported by the evidence. The court heard testimony from Joan Henkle, the defendant's mother; Hanson; David Cosgrove, the defendant's appointed public defender on an unrelated matter; Peter M. Zeman, a psychiatrist; and Baden about the defendant's drug dependency and physical condition on August 27 and 28, 1998. The court found that the defendant was addicted to opium when he gave his statements, but, crediting the testimony of Baden, the only individual who had seen the defendant during the questioning, the dependency did not interfere with the defendant's ability to waive his *Miranda* rights. "[The fact finder] is free to juxtapose conflicting versions of events and determine which is more credible. . . . It is the [fact finder's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [fact finder] can . . . decide what— all, none, or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Bloomfield*, 74 Conn. App. 674, 678, 813 A.2d 1052, cert. denied, 263 Conn. 905, 819 A.2d 839 (2003). Baden testified that the defendant was not demonstrating any physical manifestations of withdrawal. Accordingly, it was not improper for the court to credit the testimony of

Baden, who was the only witness to observe the defendant when the statements were given. See part III.

We also note, as did the trial court, that the defendant was thirty-four years old at the time the statements were given, he had been arrested on twelve prior occasions, the police questioning was conducted in English, a language the defendant understood, and he knew how to read. Additionally, there was no evidence that the defendant was intoxicated or suffered from any mental disease, disorder or defect when he waived his rights and spoke to the police. Accordingly, under the totality of the circumstances, we conclude that there was substantial evidence to support the court's decision that the defendant knew his rights under *Miranda* and that the court properly found that he knowingly, intelligently and voluntarily had waived those rights prior to giving his statements to the police.

### III

The defendant next claims that his statements were not voluntary. We disagree.

"Irrespective of *Miranda,* and the fifth amendment itself . . . any use in a criminal trial of an involuntary confession is a denial of due process of law. . . . The voluntariness of a confession must be determined by the trial court as a preliminary question of fact . . . and we scrutinize the trial court's finding closely to ensure that it comports with constitutional standards of due process. . . .

"We have stated that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . . Is the confession the product of an essentially free and uncon-

strained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . [W]e review the voluntariness of a confession independently, based on our own scrupulous examination of the record." (Citations omitted; internal quotation marks omitted.) *State* v. *Hafford*, supra, 252 Conn. 298–99.

"Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Under the federal constitution, however, coercive police activity is a necessary predicate to the finding that a confession is not voluntary . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Pinder*, supra, 250 Conn. 419.

"The trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . On the ultimate issue of voluntariness, however, we will conduct an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 328–29, 696 A.2d 944 (1997).

In this case, there was no evidence that the police used threats or coercion in obtaining the defendant's confession. The defendant contends that his statements were involuntary because "[t]he police took advantage of his [withdrawal symptoms] to overbear his will."

At the suppression hearing, Henkle, Hanson, Cosgrove, Zeman and Baden testified about the defendant's drug.addiction and his physical condition on August 27 and 28, 1998. Henkle, the defendant's mother, testified that the defendant had been addicted to drugs and alcohol since the age of fourteen. Hanson, the defendant's probation officer, testified that the defendant was on methadone at the time of his arrest. Cosgrove, the defendant's appointed public defender on an unrelated matter, testified that when he saw the defendant on the afternoon of August 28, 1998, the defendant looked "dope sick," as if he were "withdrawing from opiates." Zeman, a psychiatrist, testified that he evaluated the defendant on March 26 and July 30, 1999. From his evaluation, Zeman was able to determine that the defendant was addicted to drugs. Zeman also testified that symptoms of opiate withdrawal normally begin to occur approximately twenty to twenty-one hours after a patient's last dose of methadone, but "full-blown withdrawal symptoms" normally do not occur until thirty hours after a patient's last dose and may not occur until forty-eight hours after the last dose. Finally, Baden testified that when the defendant was giving his statements, he did not appear to be suffering from any physical impairments.

The court credited Baden's testimony, finding that the defendant's physical condition did not impact his ability to provide a statement voluntarily. Baden was the only individual who testified who saw the defendant during the time period when the statements were given. The court found that Henkle and Hanson's testimony was of no assistance on the issue of voluntariness because they did not see the defendant on August 27 and 28, 1998, and the court found that Cosgrove's testimony was unreliable. Because there was no evidence as to when the defendant had received his last methadone dosage and no medical record was introduced indicat-

ing his medical condition when he gave his statements, the court determined that his claim that he was suffering from severe withdrawal symptoms was not credible.

Our scrupulous examination of the record reveals that the court's finding that the defendant's statements were voluntary was not improper. It is within the province of the trier of fact to determine which evidence to credit and which to ignore. The court found that no coercive police conduct had occurred. The evidence credited by the court established that the defendant was not suffering from a physical condition that would impair his ability to give a statement voluntarily. Without the predicate showing of coercive police activity, the defendant's statements were not given involuntarily. Accordingly, on the basis of the totality of the circumstances, our thorough review of the record reveals that the court properly found that the defendant voluntarily gave his statement to the police.

IV

The defendant next claims that his conviction of robbery in the first degree and assault of a victim sixty years of age or older in the first degree violated article first, § 8, because he could have received a life sentence and had not first been afforded a probable cause hearing. We disagree with the defendant's claim in regard to his conviction of robbery in the first degree, but agree with his claim in regard to his conviction of assault of a victim sixty years of age or older in the first degree.

The following facts and procedural history are relevant to our resolution of the defendant's claim. On August 28, 1998, the defendant was charged with felony murder in violation of § 53a-54c, robbery in the first degree in violation of § 53a-134 (a) (1) and assault in the first degree in violation of § 53a-59 (a) (3).[3] Pursuant

---

[3] By the time of trial, the charge pursuant to General Statutes § 53a-59 (a) (3) had been changed to General Statutes § 53a-59a (1), assault on a victim sixty years of age or older in the first degree.

to General Statutes § 54-46a, the court held a probable cause hearing on November 9 and 17, 1998. At the conclusion of the two day hearing, the court found that the state had presented sufficient evidence to find probable cause that the crime of felony murder had been committed, with robbery as the underlying felony, and that the defendant had committed the crime. The defendant entered pleas of not guilty.

The state filed a substitute information on December 21, 1998, amending the information to charge the defendant with assault of a victim sixty years of age or older in the first degree in violation of § 53a-59a. On December 28, 1999, the state filed a part B information, pursuant to General Statutes § 53a-40b, charging that the defendant had committed the offenses set out in the first part of the information while on release pursuant to General Statutes §§ 54-63a through 54-63g, and that he was a persistent dangerous felony offender pursuant to General Statutes § 53a-40, thereby subjecting him to the possibility of being sentenced to a term of life imprisonment on the robbery and assault counts. The defendant subsequently filed a motion to dismiss the part B information on the ground that he had not been provided with a probable cause hearing within the sixty day period provided for under article first, § 8, and § 54-46a.

On April 10, 2000, the court, after a probable cause hearing, denied the defendant's motion to dismiss, finding that there was sufficient probable cause to believe that the defendant was a persistent dangerous felony offender. The court did not make any findings of probable cause as to the robbery or assault charges at that hearing. The defendant entered pleas of not guilty to the part B information.

On October 17, 2000, the defendant filed a motion to reconsider the denial of his motion to dismiss the part

B information. The motion to reconsider was granted. The court, after hearing argument, denied the defendant's motion to dismiss the part B information, finding that the defendant had been provided with a timely probable cause hearing. Although the April 10, 2000 hearing was held after sixty days from the state's filing of the part B information, the court found that there was excludable time due to the actions of the defendant.[4] The defendant was convicted of all counts on June 6, 2001, when he entered a plea of nolo contendere to the part B information, thereby reserving his right to appeal. On appeal, the defendant contends that his conviction of robbery in the first degree and assault of a victim sixty years of age or older in the first degree, and their resultant life sentences, should be reversed because he was not provided with a probable cause hearing within sixty days of the filing of the information.

Article first, § 8, as amended by article seventeen of the amendments, provides in relevant part: "No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law . . . ." Similarly, § 54-46a (a) provides in relevant part: "No person charged by the state . . . shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. . . ." Our legislature, in enacting § 54-46a (b), required that, unless waived by the defendant or extended by the court for good cause shown, the probable cause

---

[1] In October, 1999, the defendant filed a pro se motion seeking to disqualify his court-appointed public defenders. The court subsequently appointed a special public defender to assist the defendant. At a hearing held on January 28, 2000, one month after the state filed the part B information, the defendant's court-appointed special public defender notified the court that the defendant was "waiving the sixty day time period during which the probable cause hearing must occur," until the court ruled on his disqualification motion.

hearing must be conducted "within sixty days of the filing of the complaint or information . . . ." General Statutes § 54-46a (b). Accordingly, our resolution of the defendant's claim turns on whether the defendant was afforded a probable cause hearing on the robbery and assault counts within sixty days after the filing of the complaint or information.

## A

The defendant does not claim that the probable cause hearing held on November 9 and 17, 1998, for the determination of whether probable cause existed to find that he had committed felony murder was untimely or insufficient as to the finding of probable cause for felony murder. At that hearing, the court found that there was sufficient probable cause to find that the defendant had committed felony murder.

For the court to have found probable cause for felony murder, it also must have found that there was probable cause to establish that the defendant had committed the underlying felony. See General Statutes § 53a-54c. In this case, the underlying felony for the felony murder charge was robbery in the first degree. Accordingly, for the court to have found probable cause to establish that the defendant had committed felony murder, it also must have found that there was probable cause to establish that he had committed the underlying felony of robbery in the first degree.

At the probable cause hearing, the defendant's counsel argued that the state's evidence did not establish that the elements of robbery in the first degree had been met. The court, however, in finding probable cause for felony murder, found that during the altercation between the defendant and the victim, the defendant had asked for the victim's wallet on "one or more occasions." Therefore, although there was no explicit finding of probable cause, the court did find, in the probable

cause hearing on November 9 and 17, 1998, that there was probable cause to find that the defendant had committed robbery in the first degree. Accordingly, the defendant's claim that he was not afforded a probable cause hearing on the charge of robbery in the first degree is unavailing.

B

The defendant next contends that he was not afforded a probable cause hearing on the assault charge as enhanced by the part B information. We agree.

Article first, § 8, and § 54-46a require that a preliminary hearing be held within sixty days of the filing of the complaint or information. "In *State* v. *Mitchell*, 200 Conn. 323, 332, 512 A.2d 140 (1986), [our Supreme Court] recognized that an adversarial probable cause hearing is a critical stage in the prosecution of a defendant and held that under the express terms of article first, § 8, of our state constitution as amended, [a valid probable cause hearing] is a jurisdictional prerequisite to continuing prosecution." (Internal quotation marks omitted.) *State* v. *Niblack*, 220 Conn. 270, 275–76, 596 A.2d 407 (1991).

In its brief, the state contends that the court, in finding probable cause for felony murder on November 17, 1998, made the findings necessary for the finding of probable cause on the assault charge. Although the court's finding of probable cause for felony murder included facts that would support a finding of probable cause for the assault charge, there is no indication that the court ever made such a determination. Furthermore, because assault in the first degree, unlike robbery in the first degree, is not a predicate offense for felony murder, the court did not necessarily determine that there was probable cause to find that the defendant had committed assault in the first degree when it determined that there was probable cause that he had committed felony murder. The probable cause hearing on November 9 and 17, 1998, was for the felony murder count, with the underlying felony

being robbery in the first degree. The hearing was held to determine only whether there was probable cause to find that the defendant had committed felony murder and robbery in the first degree. At no point did the court make a finding of probable cause on the assault count, as was required by article first, § 8, and § 54-46a. Accordingly, the defendant was not afforded a probable cause hearing on the charge of assault of a victim sixty years of age or older in the first degree.

Having found that the defendant was not provided with a probable cause hearing under the dictates of our state constitution and statutes, we must determine the appropriate remedy. The state argues, relying on *State* v. *Smith*, 69 Conn. App. 167, 796 A.2d 575, cert. denied, 260 Conn. 930, 798 A.2d 973 (2002), and *State* v. *Lewis*, 176 Conn. 270, 407 A.2d 955 (1978), that we should remand the case to the trial court for resentencing. The defendant, in turn, argues that he is entitled to a new probable cause hearing concerning the assault charge. We conclude that *Lewis* controls our resolution of the issue.

In *State* v. *Lewis*, supra, 176 Conn. 270, the defendant had been charged with robbery in the second degree. Prior to the start of the trial, the state filed a two part substitute information, charging the defendant with being a persistent felony offender. Id., 271. The defendant was convicted of the robbery count and sentenced under the persistent felony offender statute to an indeterminate term of incarceration, with a maximum allowable penalty of life imprisonment. Id. On appeal, the defendant claimed that the state did not first obtain a grand jury indictment, as was required by article first, § 8. Id., 271–72. Stating that "the penalty for a conviction of robbery compounded by a conviction under the persistent felony offender statute could have been life imprisonment"; id., 273; our Supreme Court held that it was mandatory that the defendant first be indicted by a grand jury before standing trial, and reversed the judgment and remanded the case for resentencing. Id., 272–73.

Similarly, in this case, the defendant was not afforded a timely probable cause hearing after the state filed the part B information, which subjected him to a possible life sentence. The part B information was filed on December 28, 1999, and the hearing was held on April 10, 2000. At that hearing the court found only that there was sufficient probable cause to believe that the defendant was a persistent felony offender. It did not, however, make a finding that there was sufficient probable cause to believe that the defendant assaulted a victim sixty years of age or older. Accordingly, the part B information as it relates to the charge of assault of a victim sixty years of age or older in the first degree must be dismissed. The enhanced sentence for the defendant's conviction of assault of a victim sixty years of age or older in the first degree must be vacated and the case remanded for resentencing on the first part of the information. "The proceeding under the first part of the information was distinct, so it is not affected by the dismissal of the second part. . . . It is the sentence and not the verdict that was erroneous . . . ." (Citation omitted.) Id., 273.

V

The defendant next claims that the verdict on the charges of assault of a victim sixty years of age or older in the first degree and reckless indifference manslaughter is mutually inconsistent with the verdict on the charges of intentional manslaughter and robbery in the first degree. We disagree.

The following facts and procedural history are relevant to our resolution of the defendant's claim. Following the jury trial, the defendant was found guilty of felony murder in violation of § 53a-54c, robbery in the first degree in violation of § 53a-134 (a) (1), assault of a victim sixty years of age or older in the first degree in violation of § 53a-59a, intentional manslaughter in the first degree in violation of § 53a-55 (a) (1) and reckless indifference manslaughter in the first degree in violation of § 53a-55 (a) (3).

The defendant subsequently filed a motion in arrest of judgment, claiming that the verdict on all counts was legally and logically inconsistent. Specifically, the defendant claimed that the verdict on the charges of felony murder and robbery in the first degree was negated by the verdict on the charges of assault of a victim sixty years of age or older in the first degree and that the verdict on the charge of intentional manslaughter was negated by the verdict on the charge of reckless indifference manslaughter.

Following argument, the court denied the defendant's motion in arrest of judgment. Initially, the court merged the conviction on the two manslaughter charges into the conviction of felony murder and stated that as a result of the merger, it could not lawfully impose a sentence on the conviction of the two manslaughter counts.

With respect to the remaining three counts, the court found that the verdict was not legally or logically inconsistent. Relying on our decision in *State* v. *Mooney*, 61 Conn. App. 713, 767 A.2d 770, cert. denied, 256 Conn. 905, 772 A.2d 598 (2001), the court found that "the defendant could have possessed the relevant mental states of intent and recklessness at different times during the commission of the crime." Specifically, the court found: "[T]he jury could have found that the defendant pushed the victim to the ground and kicked him about the upper body several times in an effort to get the victim to give up his wallet and, or, to cease resisting the defendant's efforts to get the wallet. The jury could then have gone on to find that as the victim continued to resist, the defendant's intent turned to recklessness by his continuing to strike the victim and by ultimately stomping the victim in the head.

"Conversely, the jury could have started out by finding that the defendant recklessly assaulted the victim because the defendant was upset about the victim's drinking his beer or the defendant was upset because

he had been thrown out of Marty's Cafe. The jury could then have gone on to find that the defendant then decided to steal the victim's wallet and continued to use physical force to accomplish that end. Thus, under either scenario, the jury could have found that the defendant acted recklessly during a portion of the events and intentionally at other times."

"To determine whether a jury verdict is legally inconsistent, we look carefully to determine whether the existence of the essential elements for one offense negates the existence of the essential elements for another offense of which the defendant also stands convicted. If that is the case, the verdicts are legally inconsistent and cannot withstand challenge. . . . Put more simply, we determine if there is a rational theory by which the jury could have found the defendant guilty of [all the] crimes." (Internal quotation marks omitted.) *State* v. *Kuranko*, 71 Conn. App. 703, 714, 803 A.2d 383 (2002).

The defendant contends that his conviction cannot stand because he was convicted of two crimes, assault of a victim sixty years of age or older in the first degree and reckless indifference manslaughter, which required proof of a mental state of recklessness, and two crimes, robbery in the first degree and intentional manslaughter, which required proof of a mental state of intent, for the same acts against the same victim. Initially, we note that the statutory definitions of intent and recklessness are mutually exclusive and inconsistent. *State* v. *Hawthorne*, 61 Conn. App. 551, 554, 764 A.2d 1278 (2001). "Reckless conduct is not intentional conduct because one who acts recklessly does not have a conscious objective to cause a particular result. . . . Therefore, the transgression that caused the victim's injuries was either intentional or reckless; it could not, *at one and the same time*, be both. . . . Where a determination is made that one mental state exists, to be

legally consistent the other must be found not to exist. *. . . By no rational theory could the jury have found the defendant guilty of both crimes.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *King*, 216 Conn. 585, 594, 583 A.2d 896 (1990), on appeal after remand, 218 Conn. 747, 591 A.2d 813 (1991). We also note, however, that "[i]t is not inconsistent . . . to find that a criminal defendant possesses two different mental states, as long as [the] different mental states relate to different results." (Internal quotation marks omitted.) *State* v. *Morascini*, 62 Conn. App. 758, 762, 772 A.2d 703, cert. denied, 256 Conn. 921, 774 A.2d 141 (2001).

The defendant principally relies on our Supreme Court's holding in *State* v. *King*, supra, 216 Conn. 585. In *King*, "the defendant was charged with the crimes of attempt to commit murder and assault in the first degree. Both counts were predicated on the same act carried out against the same victim. . . . While the charge of attempt to commit murder required proof that the defendant intended to cause the victim's death, the assault charge, as set forth in the information, required proof that the defendant recklessly created a risk of death to the victim. . . . Our Supreme Court, noting that the statutory definitions of 'intentionally' and 'recklessly' are mutually exclusive, vacated the conviction of assault in the first degree and attempt to commit murder, and ordered a new trial on both counts. . . . The court reasoned that '[w]here a determination is made that one mental state exists, to be legally consistent the other must be found not to exist. . . . By no rational theory could the jury have found the defendant guilty of both crimes. . . . Logically then, the jury verdicts convicting the defendant of two offenses each of which requires a mutually exclusive and inconsistent state of mind as an essential element for conviction cannot stand.' " (Citations omitted.) *State* v. *Jones*, 68

Conn. App. 562, 568–69, 792 A.2d 148, cert. denied, 260 Conn. 917, 797 A.2d 515 (2002). With those principles in mind, we address the defendant's claims.

A

We first address the defendant's claim that the verdict was legally inconsistent because the verdict on the charges of felony murder and robbery in the first degree was negated by the verdict on the charge of assault of a victim sixty years of age or older in the first degree. Specifically, the defendant claims that the verdict was inconsistent because robbery in the first degree under § 53a-134 (a) (1) is a specific intent crime requiring proof that he intended to cause serious physical injury to an individual in the course of a robbery while assault of a victim sixty years of age or older in the first degree under § 53a-59a required proof that he recklessly engaged in conduct that created a risk of death to another person. We disagree.

As previously stated, the defendant's claim relies on our Supreme Court's holding in *State* v. *King*, supra, 216 Conn. 585. That reliance, however, is misplaced. In finding that the defendant's conviction of attempt to commit murder and assault was inconsistent in *King*, our Supreme Court stated that the jury necessarily found that the defendant had acted recklessly and intentionally *at the same time.* Id., 594. That is not the case here. "It is not inconsistent . . . to find that a criminal defendant possesses two different mental states, as long as [the] different mental states relate to different results." (Internal quotation marks omitted.) *State* v. *Kuranko*, supra, 71 Conn. App. 714. Therefore, if there is a rational theory by which the jury could have found the defendant guilty of both robbery in the first degree and assault of a victim sixty years of age or older in the first degree, the verdict was not inconsistent. See *State* v. *Morascini*, supra, 62 Conn. App. 762.

There was evidence before the jury that could have enabled it to conclude that the defendant had intended to cause serious physical injury to the victim when he repeatedly kicked the victim's torso in an attempt to obtain the victim's wallet and, then, as the victim resisted, the defendant's intent to cause serious physical injury could have been transformed to recklessness as he kicked the victim in the head, creating a risk of death. "The jury was free to conclude that the defendant's actions constituted different crimes that occurred on an escalating continuum." *State* v. *Mooney*, supra, 61 Conn. App. 722. Because the jury was not required to find that the defendant had acted with two different mental states simultaneously, its verdict was not legally inconsistent. See *State* v. *Jones*, supra, 68 Conn. App. 570.

### B

We need not review, at this time, the defendant's claim that his conviction of intentional manslaughter and reckless indifference manslaughter was inconsistent. The defendant was not sentenced on the manslaughter counts. At sentencing, the court properly merged the defendant's conviction of the two manslaughter counts and combined it with the conviction of felony murder. See *State* v. *Cerreta*, 260 Conn. 251, 258 n.6, 796 A.2d 1176 (2002); *State* v. *Chicano*, 216 Conn. 699, 725, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991); *State* v. *Barber*, 64 Conn. App. 659, 677, 781 A.2d 464, cert. denied, 258 Conn. 925, 783 A.2d 1030 (2001). By combining the conviction of the two manslaughter counts with the felony murder conviction, the conviction on the manslaughter counts was not merged out of existence. See *State* v. *Cecarelli*, 32 Conn. App. 811, 827, 631 A.2d 862 (1993). "This leaves the part of the conviction on the lesser offense unaffected should the compound offense be invalidated as a matter of law.

*The convictions on the lesser offenses would not exist as separate convictions so long as the [felony murder] conviction remained in place."* (Emphasis added; internal quotation marks omitted.) *State* v. *Chicano,* supra, 723. Accordingly, as long as the defendant's felony murder conviction stands, the merged conviction on the two counts of manslaughter does not exist as a separate conviction. Because the defendant does not challenge the propriety of his felony murder conviction, we need not address his claim.

## VI

The defendant's last claim is that his right of confrontation was violated when the court permitted the state to introduce into evidence the probable cause hearing testimony of a witness who was unavailable to testify at his trial. We disagree.

The following facts are relevant to our resolution of the defendant's claim. Gerld Podlack testified at the probable cause hearing on November 9, 1998. On direct examination, Podlack testified that at approximately 7 p.m., on August 26, 1998, he went for his daily walk near Roosevelt School. During the walk, he saw a man lying on the ground and the defendant standing over the man. Upon seeing Podlack, the defendant called out, "Don't worry about it, I can take care of it." Podlack continued on his walk and observed the defendant leave the scene with the victim still lying on the ground. Podlack then went to a neighbor's house and used the telephone to call the police.

On cross-examination, Podlack testified that he does not wear glasses, and that the closest he came to the defendant and the victim on the evening of August 27, 1998, was about 100 feet. He did not see the defendant holding anything in his hands or putting anything into his pockets. Podlack did not see the defendant touch the victim in any way, nor did Podlack see anything on

the ground near the victim. Podlack testified that he saw the defendant pacing near the victim and that it "looked like something was wrong," but that he was not watching the defendant and the victim very closely.

At trial, the state called Waltraut Podlack, Gerld Podlack's wife, as a witness. Waltraut Podlack testified that in May, 2000, while she was working in her garden, she found a wallet and watch. Upon opening the wallet, she saw a picture of the victim. Waltraut Podlack then gave the wallet and watch to her husband to give to the victim's family.

On cross-examination, the defendant introduced into evidence a statement that Waltraut Podlack gave to the police after finding the wallet and watch. In the statement, she stated that she found the wallet in her garden, but made no mention of finding a watch. When questioned about the omission in the statement, she testified that she did not know why there was no reference to the watch in her statement.

On redirect examination, Waltraut Podlack testified that she recovered the wallet and watch in her garden. She further testified that she did not know why her statement to the police did not include the fact that she also found the watch.

Gerld Podlack was not called as a witness during the trial because of health issues. The state sought to introduce into evidence his testimony from the probable cause hearing. The defendant did not question the unavailability of Gerld Podlack to testify at the trial. Rather, it was the defendant's contention that the probable cause hearing testimony was unreliable because at the time when Gerld Podlack testified at the probable cause hearing, the victim's wallet and watch had not yet been found in the garden. The court permitted the state to play for the jury an audiotape of Gerld Podlack's testimony at the probable cause hearing.

On appeal, the defendant claims that his sixth amendment right to confront the witnesses against him was violated because he was not afforded the opportunity to question Gerld Podlack adequately because the victim's wallet and watch were not found in the garden until after the probable cause hearing. Because the factual basis to question Gerld Podlack about the wallet and watch did not exist at the time of the probable cause hearing, the defendant contends that he had no reason to question the testimony at the probable cause hearing that Gerld Podlack never came closer to the victim than 100 feet.

Even if we were to assume, without deciding, that it was improper for the court to admit into evidence the probable cause hearing testimony of Gerld Podlack, the court's ruling was harmless. "The correct inquiry for identifying harmless constitutional error is to ask whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Internal quotation marks omitted.) *State* v. *Slimskey*, 257 Conn. 842, 859, 779 A.2d 723 (2001).

Upon careful review of the record, we conclude that any impropriety by the court in admitting into evidence the probable cause hearing testimony of Gerld Podlack was harmless beyond a reasonable doubt. The importance of questioning him about the wallet was limited, given that the defendant had confessed to the police

that he took the wallet. At trial, the state introduced into evidence the two confessions that the defendant gave to the police while he was in custody on August 27 and 28, 1998. In his statement on August 28, 1998, the defendant stated that while he was struggling with the victim, the victim's wallet fell out of his pockets. The defendant then stated that he grabbed the wallet and looked through it to see if there was any money. Upon leaving the scene, the defendant took the wallet and then disposed of it when he did not find that it contained any money. The wallet was not discovered until approximately eighteen months after the victim was killed. Further, Gerld Podlack's testimony, which was subjected to cross-examination at the probable cause hearing, revealed that he never saw the wallet and was not in a position to take the wallet. Accordingly, because the defendant had admitted taking the wallet from the victim, any impropriety that may have resulted in the court's admitting into evidence Gerld Podlack's probable cause hearing testimony was harmless beyond a reasonable doubt.

The judgment is reversed only as to the enhanced sentence for conviction of assault of a victim sixty years of age or older in the first degree and the case is remanded with direction to dismiss that portion of the part B information that relates to that charge and for resentencing. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.