## STATE OF CONNECTICUT *v.*
## LAWRENCE C. KURANKO
## (AC 20577)

Lavery, C. J., and Mihalakos and Daly, Js.

Argued March 27—officially released August 20, 2002

*Lawrence C. Kuranko*, pro se, the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *Mary M. Galvin*, state's attorney, and *L. Mark Hurley*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

DALY, J. The defendant, Lawrence C. Kuranko, appeals from the judgment of conviction, rendered after a jury trial, of assault of a victim sixty years of age or older in the third degree in violation of General Statutes (Rev. to 1999) § 53a-61a (a)[1] and reckless endangerment in the first degree in violation of General Statutes § 53a-63 (a).[2] On appeal, the defendant claims that the trial court improperly (1) permitted the state to use evidence of the defendant's post-*Miranda*[3] silence against him in violation of his constitutional right to due process and (2) permitted the jury to return an inconsistent verdict. We affirm the judgment of the trial court.

---

[1] General Statutes (Rev. to 1999) § 53a-61a (a) provides in relevant part: "A person is guilty of assault of a victim sixty or older in the third degree when he commits assault in the third degree under section 53a-61 and the victim of such assault has attained at least sixty years of age . . . ."

[2] General Statutes § 53a-63 (a) provides: "A person is guilty of reckless endangerment in the first degree when, with extreme indifference to human life, he recklessly engages in conduct which creates a risk of serious physical injury to another person."

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The jury reasonably could have found the following facts. From 1994 to 1998, the defendant, an attorney, represented J.F. Barrett Co. and its former president, Donald Barrett, in various legal matters, including the company's bankruptcy petition. Although the defendant resigned from the Connecticut bar in December, 1998, he continued to assist Barrett in liquidating the company's assets to satisfy its creditors.[4]

On February, 17, 1999, the defendant called Barrett and told him that Lafayette American Bank wanted to meet with them. The bank held a $2.4 million note executed by the company that Barrett had personally guaranteed. A meeting was scheduled for February 19, 1999, at 3 p.m. That morning, the defendant and Barrett met at the Milford town hall to review the land records of two properties that Barrett was attempting to sell to raise funds to pay off the bank note. Before beginning, they decided to have a cup of coffee at a nearby restaurant. At the restaurant, the defendant and Barrett discussed the amount of money that Barrett had given the defendant to pay to the bank. Barrett claimed that the amount was $843,000, while the defendant claimed that it was around $700,000.

Without resolving their dispute, the two men returned to the town hall and reviewed the land records. Thereafter, the defendant suggested that they drive to one of Barrett's properties located at 990 Naugatuck Avenue in Milford and clean it up so that a prospective buyer could view it the following day. Barrett, who was dressed in business attire, reluctantly agreed and they drove to the property.

At the property, the defendant and Barrett entered the building through an unlocked door. The defendant brought a brown paper bag that contained black plastic

---

[4] After his resignation from the Connecticut bar, the defendant's sister, an attorney, assumed responsibility for the company's legal representation.

garbage bags into the building with him. Barrett told the defendant that he was not properly dressed for cleaning and that he was going to return to his car and drive around the property. After a while, Barrett noticed the defendant standing outside the front of the building carrying a plastic garbage bag that was partially filled with debris. The defendant told Barrett that he had left his wallet inside the building and that the door had locked behind him. Barrett and the defendant entered the building through a window in the back of the building to retrieve the wallet.

Once inside, the defendant attacked Barrett, by putting a plastic garbage bag over his head and shoulders. After a brief struggle, Barrett was able to free himself from the defendant and to pull off the bag. Both men left the building together and returned to Barrett's car where Barrett told the defendant to "get a hold of [himself]" and "stop the nonsense" because they still needed to meet with the bank. When they entered the car and Barrett started to drive, the defendant again attacked Barrett, this time by choking him with his hands. Barrett stopped the car and a struggle ensued. Eventually, Barrett managed to open the driver's side door, fall to the ground and run to the building's loading dock. The defendant pursued Barrett and attempted to choke him. Barrett grabbed the defendant by his testicles, and the defendant released him. Barrett fled to his car and shut the door, but before he could lock it the defendant opened the door and began choking him again. As Barrett repelled the defendant, Barrett fell to the ground and cut his head.

At that point, Ervin Crook, who knew Barrett, and his boss, Roger Toffolon, drove up in a minivan. Barrett scrambled into the minivan's backseat and explained that someone had tried to kill him. Toffolon called the police with Crook's cellular telephone. The defendant approached the minivan and asked to use the telephone.

Toffolon refused and notified the defendant that the police were on the way. In response, the defendant stated that he was going to jump into the nearby Housatonic River, and he walked away in the direction of the river.

Soon thereafter, Officer James Garfield of the Milford police department arrived at the scene. As Garfield was interviewing Barrett, the defendant, who was soaking wet, returned to the scene and implored Garfield to arrest him because he "did it." The defendant also told Garfield that he had jumped in the river to commit suicide. He then passed out. Both the defendant and Barrett were taken to a local hospital and treated for their injuries. The defendant was advised of his *Miranda* rights in the ambulance en route to the hospital.

At trial, the defendant testified that he did not attack Barrett with a garbage bag and that the incident inside the building did not occur. Although he admitted that he and Barrett fought outside the building, he claimed that Barrett was the aggressor and that he had acted in self-defense. The jury nevertheless convicted the defendant of assault in the third degree and reckless endangerment in the first degree.[5] This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that, pursuant to *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the trial court improperly permitted the state to use evidence of the defendant's post-*Miranda* silence

[5] The jury acquitted the defendant of the charges of attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a (a), assault of a victim sixty or older in the second degree in violation of General Statutes (Rev. to 1999) § 53a-60b (a) and reckless endangerment in the second degree in violation of General Statutes § 53a-64 (a).

against him in violation of his constitutional right to due process. We disagree.

A

The defendant first claims that the state improperly questioned Garfield and Detective William Haas regarding the defendant's failure to file a complaint against Barrett in violation of *Doyle*. We are not persuaded.

The following additional facts are relevant to our resolution of the defendant's claim. At trial, Garfield testified that, at the crime scene, the defendant admitted that he had tried to kill Barrett and asked Garfield to arrest him. Immediately following that testimony, the prosecutor asked Garfield if, at any point in their conversation, the defendant asked him to arrest Barrett. Garfield answered, "No." The prosecutor then asked, "To this day . . . has [the defendant] ever filed a formal complaint with you to have Barrett arrested for anything?" The defendant objected in accordance with *Doyle*, and the court sustained his objection. The prosecutor continued by asking Garfield whether the defendant made any complaint about Barrett at the crime scene. The defendant again objected, and the court sustained his objection. Garfield then testified, without objection, that he did not arrest Barrett and that, to his knowledge, Barrett was never arrested in connection with the incident.

During the state's direct examination of Haas, the prosecutor asked, "Did you receive any other complaints to arrest anyone else at this scene?" Haas answered, "No." Haas further testified that only the defendant was arrested in connection with the incident. When Haas finished testifying, the defendant moved to strike all testimony concerning the fact that Barrett was not arrested. The defendant argued that the fact that Barrett was not arrested was irrelevant. Alternatively, he asked the court to give the jury a limiting instruction

"to the effect that [the fact that Barrett was not arrested] is not any evidence and should not be considered as such." The court denied the defendant's motion, reasoning that striking the testimony was unnecessary because, unlike questions about the defendant's failure to file a complaint against Barrett, questions concerning the fact that Barrett was not arrested did not implicate the defendant's postarrest silence. The court, however, stated that it would give an appropriate limiting instruction.

"Ordinarily, evidence of a defendant's postarrest and post-*Miranda* silence is constitutionally impermissible under the due process clause of the fourteenth amendment. *Doyle* v. *Ohio*, [supra, 426 U.S. 610]." (Internal quotation marks omitted.) *State* v. *Berube*, 256 Conn. 742, 750, 775 A.2d 966 (2001). "The factual predicate of a claimed *Doyle* violation is the use by the state of a defendant's postarrest and post-*Miranda* silence either for impeachment or as affirmative proof of his guilt." *State* v. *Joly*, 219 Conn. 234, 256, 593 A.2d 96 (1991). "The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 713, 759 A.2d 995 (2000).

In the present case, both Garfield's and Haas' testimony clearly concerned the defendant's pre-*Miranda* silence. "Because it is the *Miranda* warning itself that carries with it the promise of protection, the United States Supreme Court has concluded that the prosecution's use of silence prior to the receipt of *Miranda* warnings does not violate due process." *State* v. *Esposito*, 223 Conn. 299, 319, 613 A.2d 242 (1992). We therefore conclude that the defendant's claim that his due process rights were violated is without merit.

## B

The defendant also claims that the state improperly questioned him during cross-examination regarding his failure to file a complaint against Barrett and commented on his post-*Miranda* silence during its closing argument to the jury in violation of *Doyle*. We are not persuaded.

The following additional facts are relevant to our resolution of the defendant's claim. During cross-examination, the prosecutor and the defendant engaged in the following colloquy:

"[Prosecutor]: Did you talk to Officer Garfield about claiming you were defending yourself?

"[Defendant]: I wanted to talk to him but I didn't. No.

"[Prosecutor]: Did you tell Officer Garfield that Donald Barrett started it?

"[Defendant]: As I said, I think the most I told him was my name.

"[Prosecutor]: Okay. And up to this day, have you ever filed a complaint to have Barrett arrested?

"[Defendant]: No."

The defendant did not object to this line of questioning, nor did he object when the prosecutor later elicited that the defendant had never filed a complaint to have Barrett arrested. At the close of the evidence, however, the defendant moved for a mistrial, claiming that the state was allowed to elicit information through its witnesses and the defendant in violation of his right to remain silent. In the event the court denied his motion, the defendant also requested a limiting instruction advising the jury either to disregard any testimony concerning his postarrest silence or not to draw an adverse inference against him from his refusal to talk

to the police. The court denied the defendant's motion for a mistrial, but in its final instructions to the jury, the court stated: "Nor, of course, should you give any weight whatsoever to that absence of evidence of charges pending against Mr. Barrett. Neither the existence nor absence of charges is relevant to the sole issue you must decide."

In his initial closing argument, the prosecutor did not mention the defendant's failure to make a complaint against Barrett. In his rebuttal, however, the prosecutor stated that the defendant "never filed a complaint with any police authority to this day that [Barrett] assaulted me. [Barrett] started it. I'm a victim."

Assuming arguendo that a *Doyle* violation occurred in the present case, we conclude that it was harmless beyond a reasonable doubt. "*Doyle* violations are . . . subject to harmless error analysis. . . . The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . .

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . . The state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . .

"A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defen-

dant's postarrest silence does not constitute reversible error. . . . The [error] has similarly been [found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the jugular of the defendant's story. . . . The cases wherein the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact on closing argument, and extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt." (Citations omitted; internal quotation marks omitted.) *State* v. *Daugaard*, 231 Conn. 195, 211–13, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995).

Here, the defendant's silence was not the focus of either the prosecutor's cross-examination of the defendant or his closing argument. The two challenged questions were a minor part of the prosecutor's extensive cross-examination of the defendant, and the prosecutor's single remark during his rebuttal argument was brief and did not serve to highlight the defendant's silence. Moreover, neither the questions nor the remark were specifically directed at postarrest, as opposed to prearrest, silence. Although questions and remarks that encompass both prearrest and postarrest silence should not be allowed; see *State* v. *Jeffrey*, 220 Conn. 698, 721, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992); the state's questions and remark in the present case cannot be said to have "struck at the jugular" of the defendant's defense, or "highlighted" the defendant's silence to the point of prejudicial error. See *State* v. *Robles*, 33 Conn. App. 60, 65, 632 A.2d 1377 (1993) (error harmless where state asked whether defendant "ever" told police that he stabbed victim).

Finally, even without the disputed questions and remark, the state had a particularly strong case against the defendant. Barrett testified extensively and consistently regarding the defendant's repeated attacks on him. His testimony was corroborated by Garfield's testimony that the defendant admitted that he tried to kill Barrett and requested that Garfield arrest him. Barrett's treating physician also testified that his injuries were consistent with manual strangulation. Moreover, when notified that the police would be arriving at the crime scene momentarily, the defendant fled the scene and jumped into the Housatonic River in an attempt to commit suicide, evidencing his consciousness of guilt.

After a careful review of the entire record, we conclude that any *Doyle* violation was so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict even without the challenged questions or remark, especially in light of the court's limiting instruction to the jury. The state therefore has established beyond a reasonable doubt that the alleged improper questioning and remark were not a factor in the trial's outcome or, in other words, that they were harmless beyond a reasonable doubt. Accordingly, the defendant's claim must fail.

## II

The defendant next claims that the court improperly permitted the jury to return an inconsistent verdict in violation of his constitutional right to due process. Specifically, the defendant argues that his conviction of assault in the third degree and reckless endangerment in the first degree is legally inconsistent because the offenses require proof that the defendant simultaneously possessed two different, mutually exclusive mental states, namely, those of intentionality and recklessness. We disagree.

To determine whether a jury verdict is legally inconsistent, "we look carefully to determine whether the existence of the essential elements for one offense negates the existence of the essential elements for another offense of which the defendant also stands convicted. If that is the case, the verdicts are legally inconsistent and cannot withstand challenge. . . . Put more simply, we determine if there is a rational theory by which the jury could have found the defendant guilty of both crimes." (Internal quotation marks omitted.) *State* v. *Johnson*, 65 Conn. App. 470, 484–85, 783 A.2d 1057, cert. denied, 258 Conn. 930, 783 A.2d 1031 (2001). "It is not inconsistent . . . to find that a criminal defendant possesses two different mental states, as long as [the] different mental states relate to different results." (Internal quotation marks omitted.) *State* v. *Morascini*, 62 Conn. App. 758, 762, 772 A.2d 703, cert. denied, 256 Conn. 921, 774 A.2d 141 (2001).

In the present case, contrary to the defendant's contention, the jury was not required to find that the defendant possessed the relevant mental states simultaneously with respect to his acts against Barrett. See *State* v. *Fernandez*, 27 Conn. App. 73, 94, 604 A.2d 1308, cert. denied, 222 Conn. 904, 606 A.2d 1330 (1992). Where, as here, there are multiple criminal acts, the jury reasonably could have found that the defendant committed one act or group of acts with one mental state and a second act or group of acts with a different mental state. See *State* v. *Hawthorne*, 61 Conn. App. 551, 555, 764 A.2d 1278 (2001); *State* v. *Glover*, 40 Conn. App. 387, 395, 671 A.2d 384, cert. denied, 236 Conn. 918, 673 A.2d 1145 (1996). Indeed, there is a compelling case for finding that the defendant's actions constituted "different crimes that occurred on an escalating continuum." *State* v. *Mooney*, 61 Conn. App. 713, 722, 767 A.2d 770, cert. denied, 256 Conn. 905, 772 A.2d 598 (2001); see also *State* v. *Fernandez*, supra, 94. For exam-

ple, on the basis of the evidence presented at trial, the jury reasonably could have found that when the defendant first attacked Barrett in the building, he acted not with the specific intent to injure Barrett physically, but rather with reckless indifference to Barrett's safety. The jury reasonably could have found, however, that the defendant's mental state had changed to an intent to injure Barrett physically when he subsequently attacked him in the car, at the loading dock and then again in the car.

Because the jury was not required to find that the defendant possessed two different mental states simultaneously with respect to his acts against Barrett, its verdict was not legally inconsistent. See *State* v. *Glover*, supra, 40 Conn. App. 395. We, therefore, conclude, on the basis of the evidence presented at trial, that the jury reasonably could have found that the defendant acted with different mental states with respect to Barrett at different times during the incident. Accordingly, the court properly accepted the verdict of guilty on both charges.

The judgment is affirmed.