******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RONALD G. SMITH
(AC 39690)

Alvord, Keller and Lavery, Js.

*Syllabus*

Convicted of the crimes of sexual assault in the fourth degree, risk of injury to a child, sexual assault in the first degree and sexual assault in the second degree, the defendant appealed. During trial, the state had offered, and the court admitted into evidence, testimony that during a taped police interview, the defendant, after answering most of the police officers' questions, refused to answer further questions, never claimed the minor victim was lying about the allegations, refused to speak further and exercised his right to remain silent. The court also had admitted into evidence from the state a video recording of the interview depicting the defendant's invocation of his *Miranda* rights to remain silent and to an attorney. On appeal, the defendant, relying on *Doyle* v. *Ohio* (426 U.S. 610), claimed for the first time that his constitutional right to remain silent was violated when the state introduced evidence of his post-*Miranda* silence. *Held* that the defendant could not prevail on his unpreserved claim that his constitutional right to remain silent was violated, as any claimed error in the court's admission of the challenged evidence was harmless beyond a reasonable doubt: although the defendant's invocation of his rights was described by more than one witness and depicted on a video presented in evidence, the prosecutor did not thereafter focus or comment on the defendant's silence, made no suggestion to the jury that it should draw an inference of guilt based on the defendant's exercise of his *Miranda* rights, made no comment on the defendant's invocation of his *Miranda* rights during closing argument and did not otherwise highlight the challenged evidence to the jury, and the challenged evidence was wholly unrelated to the defendant's exculpatory theories advanced at trial, which the jury reasonably may have found as weak given the inconsistent evidence presented in support of them; moreover, apart from the challenged evidence related to the defendant's post-*Miranda* silence, the state established the guilt of the defendant beyond a reasonable doubt, as the victim testified at length and in detail regarding the alleged assaults by the defendant, consistently identifying the defendant as his abuser to police, medical personnel, Department of Children and Families personnel and during his testimony at trial, and was able to provide locations where the abuse occurred both during interviews with the police and during his testimony at trial, and the state not only presented medical evidence that the victim had been sexually abused, but also presented evidence from which the jury reasonably could have determined the defendant was the abuser.

Argued November 29, 2017—officially released March 13, 2018

*Procedural History*

Information in the first case charging the defendant with the crimes of sexual assault in the fourth degree, risk of injury to a child and sexual assault in the first degree, substitute information in the second case charging the defendant with the crimes of sexual assault in the second degree and risk of injury to a child, and substitute information in the third case charging the defendant with the crimes of sexual assault in the first degree and risk of injury to a child, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Suarez, J.*; verdicts and judgments of guilty, from which the defendant appealed. *Affirmed.*

*Richard S. Cramer*, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *Debra Collins*, senior assistant state's attorney, and *Toni M. Smith-Rosario*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Ronald G. Smith, appeals from the judgments of conviction, rendered after a jury trial, of one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A), six counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2), six counts of risk of injury to a child in violation of § 53-21 (a) (1), two counts of sexual assault in the first degree in violation of General Statutes § 53-70 (a) (2), and three counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1). On appeal, the defendant, relying upon *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 48 L. Ed. 2d 91 (1976), claims that the state violated his constitutional right to remain silent when it introduced evidence of the defendant's post-*Miranda* silence.[1] We conclude that any claimed error was harmless beyond a reasonable doubt. Accordingly, we affirm the judgments of the trial court.

The jury reasonably could have found the following facts. The defendant met the victim[2] between November, 2007 and November, 2008, when the victim was nine years old. At that time, the victim lived in an apartment in Hartford with his mother, his grandmother, and his younger sibling, who was the child of the defendant and the victim's mother. The defendant was dating the victim's mother and would spend time daily at the apartment.

On one occasion, when the victim was nine years old, he was watching television in the bedroom he shared with his mother when the defendant came into the room to play wrestle. The defendant then took his penis out, rubbed it on the victim's arm, and tried to rub it near the victim's mouth. The victim tried to push away from the defendant. The victim's mother entered the room and asked what the defendant was doing. Both the defendant and the victim said that the defendant was not doing anything. The victim did not tell his mother what the defendant did to him because "it just felt weird and she wouldn't have believed me anyways," and "she would take his side over mine sometime."

The defendant lived with his mother and would bring the victim to his house to play with another of the defendant's children. On one such occasion, the victim, who was ten years old at the time, was in the basement at the defendant's house when the defendant told the victim to come near him and to pull his pants down and lie on the bed. The defendant pulled his pants down, spit on his hand, rubbed his penis, and anally penetrated the victim. When the victim tried to sit up to get away, the defendant laid the victim against the bed face down and held him down. The victim made a whining noise, and the defendant told him to "shut up." The defendant ejaculated into the victim's anus. After this incident,

the victim was in pain and would see blood when he used the bathroom. The victim did not tell his mother what happened because he did not think she would believe him. The defendant anally penetrated the victim on more than twenty occasions when the victim was ten years old. The victim did not tell anyone the defendant was doing this because he "didn't want anyone to think [he] was gay . . . ." The defendant offered to give and gave the victim toys and money in exchange for letting the defendant perform these acts.

The defendant fathered a child with a woman who lived in Windsor, and the defendant would bring the victim to visit that child at the woman's home (Windsor home). On one occasion before Christmas when the victim was eleven or twelve, the defendant bought the victim an iPod and told the victim "now you have to let me fuck you." The defendant drove the victim to the parking lot of the Windsor home and covered the back seat windows of the car. The defendant spit on his hand, rubbed his penis, and anally penetrated the victim. The defendant ejaculated, and then drove the victim home and told the victim to tell his mother that they were loading the defendant's truck. Between November, 2009 and January, 2011, the defendant continued to anally penetrate the victim, and did so more than ten times in the parking lot of the Windsor home.

On one occasion, when the victim was thirteen years old, the defendant asked the victim's mother if he could take the victim to help him load his truck. The defendant took the victim to a motel in Windsor Locks, showed the victim pornography on the television and told the victim "to do the same thing that's in the porno." The defendant again spit on his hand, rubbed his penis, and anally penetrated the victim. On another occasion, the defendant put his penis into the victim's mouth and ejaculated into his mouth. Afterward, the defendant bought the victim a BB gun.

In April or May, 2013, the victim told his mother what the defendant was doing to him, but when his mother said she would call the cops, the victim said "never mind." The victim, wanting the abuse to stop and in an attempt to break up the defendant and his mother, also told his mother that the defendant was "cheating on her," and testified that he "was cheating on her with me really."

On one occasion in August, 2013, the defendant again took the victim, who was fourteen at the time, to a motel in Windsor Locks. The defendant told the victim to take off his clothes, laid the victim across the bed, and anally penetrated the victim. The incident lasted "longer than before" and "hurt more." The victim told the defendant to stop but he did not. The victim told the defendant he "was finished with it" and "wasn't doing that anymore," and the defendant laughed. After this incident, the victim felt a painful "bubble inside of

[his] anus." He told his mother that he had hemorrhoids from a bicycle accident and asked to go to the family doctor. The victim saw Idaresit Udo, a physician, on August 21, 2013. The victim did not tell the doctor about the abuse because his mom was present. The victim went home and his symptoms worsened to the point where he experienced difficulty getting out of bed.

Also in August, 2013, the Department of Children and Families (department) became involved with the victim after receiving an anonymous report that his mother was leaving younger children alone in the home with the victim throughout the night. When the department responded to the home on or about August 26, 2013, the victim was observed to be in pain. The next day, Dante Rabb, an investigator with the department, visited the victim's home. He observed the victim lying in bed and crying in pain, saying his buttocks area hurt. Rabb asked the victim if he wanted to see a doctor and he hesitated, looked at his mother, and finally said yes. Rabb and the victim's grandmother brought him to the doctor's office. The victim's mother did not accompany them because she stated she did not have time. The victim saw Fonda Gravino, a physician, and told her that the defendant had been having anal intercourse with him. Dr. Gravino performed a physical exam and noted abrasions and ulcerations, which injuries she concluded were a result of child sexual abuse. Dr. Gravino and the victim telephoned the victim's mother and the victim told his mother that the defendant had been sexually abusing him for the past five years.

The victim's mother telephoned the Hartford Police Department to report the sexual assault, and Officer Tyrone Boland responded. Boland transported the victim from Dr. Gravino's office to the Connecticut Children's Medical Center, where he was admitted. During the drive, the victim told Boland that his mother's boyfriend had sexually assaulted him. While at the hospital, the victim's mother asked Rabb and Boland how long it was going to take and said that she had "things to do." Also at the hospital, the victim told others, including Rabb and Nina Livingston, a child abuse pediatrician, that the defendant had been sexually abusing him for years. Dr. Livingston diagnosed the victim with "suspected sexual abuse," and concluded that the victim's injuries were not caused by a bicycle accident. Dr. Livingston further observed symptoms of psychological distress that could have been consistent with post-traumatic stress and depression and recommended trauma-focused counseling.[3] The victim remained in the hospital for almost a week, and was diagnosed with a sexually transmitted disease. After the victim was released from the hospital, he went to live with his aunt.

The defendant voluntarily submitted to interviews with both the Hartford and Windsor Police Departments, and officers from both departments submitted

arrest warrant applications. Later, on December 23, 2013, members of a police fugitive task force arrived at the Windsor home, where the defendant was located. After several hours of refusing to open the door to the task force, the defendant was arrested. The defendant elected a jury trial.

During trial, the state presented the testimony of Boland and Detective Shawn Ware, both of the Hartford Police Department, and Officer Russell Winiger of the Windsor Police Department. Boland and Ware testified regarding the September 10, 2013 interview (Hartford interview). Ware testified that the defendant drove himself to the Hartford Police Department on that date. Boland, Detective Danny Johnson, and Ware were present for the Hartford interview. Ware advised the defendant of his *Miranda* rights, and the defendant signed a waiver of rights form.[4] The form was entered into evidence without objection from defense counsel. Ware described the defendant's demeanor during the Hartford interview, stating that he went from cooperative to standoffish. Ware testified that at no time did the defendant ever claim that the victim was lying about the allegations.[5] Defense counsel did not object to Ware's testimony.

The Hartford interview was recorded and the video recording was entered into evidence without objection and played for the jury. The video captured the full Hartford interview of the defendant, including the defendant's statements at the end of the recording in response to the question whether the defendant "ever took [the victim] to a hotel where there was a guy there that said to you why are you bringing a kid here in Windsor." The defendant responded that he had to "stop right now." He further stated that "[t]his is a serious accusation" and "[w]hat I say now will be used against me period. Whether I'm right or wrong right now. . . . [I]f I answer it wrong or incorrectly and it proved to be otherwise then, you know, how can I defend myself properly." He mentioned a lawyer, specifically stating at one point: "Can't answer it. I have to get a lawyer." At no point during the presentation of the video did defense counsel object. The court took a recess and then the prosecutor resumed direct examination. On cross-examination, defense counsel asked Ware whether it was fair to say that the defendant never admitted during the Hartford interview that anything occurred between him and the victim.[6]

Boland was also present during the Hartford interview but did not question the defendant. Boland testified that the defendant answered most of the questions posed by Ware, but "[t]owards the end he decided he wasn't going to answer any more questions." Boland stated that the defendant did not claim during the Hartford interview that the victim was lying about the allegations.[7] Defense counsel did not object to Boland's

testimony on this point. On cross-examination, in response to questions by defense counsel, Boland testified that the interviewing officers did not ask the defendant whether he had any sexual activity with the victim, because they "never got to that point."[8]

The state also presented the testimony of Winiger, who interviewed the defendant at the Windsor Police Department on October 10, 2013 (Windsor interview). Winiger called the defendant and asked if he would come to the police department to speak with him. The defendant drove himself to the Windsor interview. Winiger advised the defendant of his *Miranda* rights.[9] The defendant signed a waiver of rights form, which was entered into evidence without objection. Winiger testified regarding the Windsor interview, and explained how the interview concluded. Specifically, he testified that the defendant told him that he had a sexually transmitted disease. When Winiger told the defendant that the victim also had a sexually transmitted disease, the defendant ended the Windsor interview.[10] At no time during Winiger's testimony did defense counsel object.

At the conclusion of trial, the jury found the defendant guilty of all charges. The court sentenced the defendant to a total effective sentence of forty-five years imprisonment. This appeal followed.

On appeal, the defendant claims that the state violated his constitutional right to remain silent, as set out in *Doyle*, by introducing evidence of his post-*Miranda* silence. Specifically, the defendant challenges the introduction of the following evidence: (1) Boland's testimony that the defendant refused to answer further questions and that he never claimed the victim was lying about the allegations; (2) Ware's testimony that the defendant refused to speak further; (3) the video recording of the Hartford interview depicting the defendant's invocation of his right to remain silent and his right to an attorney; and (4) Winiger's testimony that the defendant exercised his right to remain silent.[11]

"In *Doyle* . . . the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding [on] two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (Internal quotation marks omitted.) *State* v. *Holmes*, 176 Conn. App. 156, 189–90, 169 A.3d 264, cert. granted

on other grounds, 327 Conn. 984, 175 A.3d 561 (2017); see also *State* v. *Ramos*, 178 Conn. App. 400, 408–409, 175 A.3d 1265 (2017), cert. denied, 327 Conn. 1003, A.3d (2018). "A *Doyle* violation also encompasses a prosecutor's comment upon a defendant's statement requesting an attorney. . . . With respect to post-*Miranda* warning . . . silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." (Citation omitted; internal quotation marks omitted.) *State* v. *Daugaard*, 231 Conn. 195, 211, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d. 666 (1995).

The defendant acknowledges that he did not preserve his *Doyle* claim at trial and now seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[12] "[T]he inability to meet any one prong requires a determination that the defendant's claim must fail. . . . The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Soto*, 175 Conn. App. 739, 755, 168 A.3d 605, cert. denied, 327 Conn. 970, 173 A.3d 953 (2017). The first two prongs of the *Golding* analysis are satisfied because the record is adequate for our review and the defendant's claim that the state violated his right to remain silent is of constitutional magnitude. See, e.g., *State* v. *Lockhart*, 298 Conn. 537, 580, 4 A.3d 1176 (2010). We conclude that the defendant's claim fails under the fourth prong of *Golding* because if there was a *Doyle* violation, it was harmless beyond a reasonable doubt.

"*Doyle* violations are . . . subject to harmless error analysis. . . . The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . . The state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Internal quotation marks omitted.) *State* v. *Jackson*, 150 Conn. App. 323, 358–59, 90 A.3d 1031, cert. denied, 312 Conn. 919, 94 A.3d 641 (2014); see also *State* v. *Montgomery*, 254 Conn. 694, 717–18, 759 A.2d 995 (2000) (*Doyle* violations subject to harmless error analysis).

"A *Doyle* violation may, in a particular case, be so

insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defendant's [post-*Miranda*] silence does not constitute reversible error. . . . The [error] has similarly been [found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the jugular of the defendant's story. . . . The cases wherein the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact on closing argument, and extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt." (Internal quotation marks omitted.) *State* v. *Montgomery*, supra, 254 Conn. 718.

Our review of the record convinces us that the admission of the challenged evidence concerning the defendant's invocation of his rights was harmless beyond a reasonable doubt. In the present case, although there were multiple references to the defendant's invocation of his rights, the remaining considerations that factor into the analysis of harm weigh in favor of the conclusion that any claimed error was harmless beyond a reasonable doubt. Accordingly, we decline to decide whether the state committed a *Doyle* violation, and we conclude that any claimed error was harmless and would not have affected the verdict.[13] See, e.g., *State* v. *Francis*, 83 Conn. App. 226, 236, 849 A.2d 873, cert. denied, 270 Conn. 912, 853 A.2d 529 (2004); see also *State* v. *Pepper*, 79 Conn. App. 1, 15, 828 A.2d 1268 (2003) ("[a]ssuming without deciding that the state violated *Doyle* in its question posed to the defendant, we conclude that any impropriety was harmless beyond a reasonable doubt"), *aff'd*, 272 Conn. 10, 860 A.2d 1221 (2004); *State* v. *Kuranko*, 71 Conn. App. 703, 711, 803 A.2d 383 (2002) ("[a]ssuming arguendo that a *Doyle* violation occurred" and concluding "that it was harmless beyond a reasonable doubt").[14]

Here, although the defendant's invocation of his rights was described by more than one witness and was depicted on a video presented in evidence,[15] the prosecutor did not thereafter focus or comment on the defendant's silence. The prosecutor made no suggestion to the jury that it should draw an inference of guilt based on the defendant's exercise of his *Miranda* rights. See *State* v. *Bereis*, 117 Conn. App. 360, 378, 978 A.2d 1122 (2009) (*Doyle* violation harmless where, inter alia, no "correlation [was made] between the defendant's refusal to answer questions and her guilt"). In fact, the prosecutor made no comment on the defendant's invocation of his *Miranda* rights during closing argument, and did not otherwise highlight the challenged

evidence to the jury. See *State* v. *Daugaard*, supra, 231 Conn. 213. This is not a case in which the prosecutor made a "strongly-worded argument suggesting a connection between the defendant's silence and his guilt." (Internal quotation marks omitted.) Cf. *State* v. *Hughes*, 45 Conn. App. 289, 292–93, 296, 696 A.2d 347 (1997) (error was not harmless where detective testified "no less than eight different times as to the defendant's request not to talk about the accusations," including that he understood the defendant's unwillingness to talk about it as "a form of guilt" and state's attorney, in closing argument, "equated the defendant's post-*Miranda* silence with guilt and consciousness of guilt" [internal quotation marks omitted]).

Moreover, the challenged evidence was not "linked to any exculpatory story advanced by the defense." *State* v. *Jackson*, supra, 150 Conn. App. 361. The evidence that the defendant claims violated *Doyle* was wholly unrelated to the defendant's exculpatory theories. See *State* v. *Camacho*, 92 Conn. App. 271, 284–85, 884 A.2d 1038 (2005) (concluding that any *Doyle* violation was harmless beyond a reasonable doubt, noting that jury may have found the defendant's alibi defense "weak" because "rebuttal witnesses could not give a consistent story," and stating that prosecutor's challenged remarks "were not used to attack the defendant's alibi"), cert. denied, 276 Conn. 935, 891 A.2d 1 (2006).

Although the defendant did not testify, he called two witnesses on his behalf, the victim's mother and his wife, to advance the following defenses: (1) someone other than the defendant had engaged in anal intercourse with the victim, (2) the victim lied about who had abused him because he did not want to admit that he was gay, and (3) the defendant was out of state for work at the time of the final instance of abuse. The jury reasonably may have found these defenses weak, given the inconsistent evidence presented in support of them.

The defendant generally sought to attack the credibility of the victim through the victim's mother, who opined that the victim was accusing the defendant of abuse because the victim did not want to admit that he was gay. The victim's mother also testified that she believed the victim had engaged in anal intercourse with a teenager, not with the defendant, based on Facebook messages she had seen between the victim and another teenager that indicated that the victim had engaged in anal intercourse for the first time with that teenager in August, 2013. The defendant points to this testimony as evidence "as to who could have committed this crime other than the defendant." This evidence was contradicted in two ways. First, the state presented medical evidence that the victim suffered physical injuries and psychological distress as a result of sexual abuse. Specifically, Dr. Livingston observed open sores in the area

above the victim's anus. Dr. Livingston also testified that the victim demonstrated symptoms of psychological distress, including experiencing flashbacks of the abuse. On the basis of this evidence, the jury reasonably could have rejected the defense's suggestion that a first-time, consensual sexual encounter with another teen-ager would produce the victim's injuries. Second, the victim's mother's testimony was called into question by the six page written statement she gave to police. The victim's mother testified that she had seen the Facebook messages "[a] week or two" after August 27, 2013. She gave her statement to police on November 4, 2013, approximately two months later. Despite having made several corrections to the police statement for accu-racy, she failed to mention the Facebook messages she saw. She testified that she did not provide the informa-tion regarding the Facebook messages to the police at the time of her statement because there were "too many things going on at that time" and because she "was still believing in [the victim.]"[16]

Through the testimony of both the victim's mother and the defendant's wife, the defendant sought to estab-lish that he was not in the state at the time of the final sexual assault in August, 2013. The defendant's wife testified that the defendant worked as a long haul truck driver and would be out of the area for periods of time. Specifically, she testified that the defendant was away working as a long haul truck driver in August, 2013, and that he was away from home at the time of their anniversary, in July, and her birthday, in August. She testified that he did not return from these particular work trips until "maybe the first week of September." The victim's mother testified that the defendant was in Florida on a job in August, 2013. This testimony was directly contradicted by other evidence. During the Hartford interview, which was conducted on September 10, 2013, the defendant told police officers that he had not worked in a couple of months. The defendant's wife's testimony was further contradicted in that she testified that they were not separated while the defen-dant told police officers that they were separated.

Moreover, apart from the challenged evidence related to the defendant's post-*Miranda* silence, the state established the guilt of the defendant beyond a reason-able doubt.[17] See *State* v. *Daugaard*, supra, 231 Conn. 213. The victim, sixteen years old at the time of trial, testified at length and in detail regarding the assaults and consistently identified the defendant as his abuser to police, to medical personnel, to department person-nel, and during his testimony at trial. The victim was also able to provide locations where the abuse occurred, both during interviews with the police and during his testimony at trial. Specifically, he had made a drawing of the surroundings, including a nearby bowl-ing alley, of the motel where the defendant had abused him, and the victim was able to identify the motel while

driving around with Winiger.[18] The defendant told police during the Hartford interview that he had taken the victim and the victim's mother to a birthday party at a hotel, which he said "might be past" a bowling alley. Both in her testimony and in her written statement, the victim's mother denied that the defendant had taken them to a party.

The state not only presented medical evidence that the victim had been sexually abused, but also presented evidence from which the jury reasonably could have determined the defendant was the abuser. The defendant concedes that the medical evidence "does support the claim that [the victim] was sodomized and subjected to terrible sexual abuse. It does not, however, support a claim that the defendant was the one who committed the acts." We disagree. Dr. Livingston testified that upon admission to the hospital in August, 2013, the victim, who was fourteen years old at the time, was diagnosed with a sexually transmitted disease. The state also presented evidence that the defendant told Winiger that he had tested positive for a sexually transmitted disease. The victim further testified that the defendant was the only male sexual partner he ever had.

In sum, we conclude that the admission of the challenged evidence concerning the defendant's invocation of his *Miranda* rights was harmless beyond a reasonable doubt. Most importantly, the state never referenced the challenged evidence in closing argument, nor did it otherwise use the evidence in such a way as to suggest the defendant's guilt. Moreover, here, as in *State* v. *Daugaard*, supra, 231 Conn. 213, the references to the defendant's invocation of his constitutional rights were "marginal in the context of the entire trial." The references were unrelated to the defendant's defenses, which were inherently weak. Lastly, the state's case, apart from the challenged evidence, was strong. Accordingly, the defendant is unable to prevail under the fourth prong of *Golding*.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[3] Specifically, Dr. Livingston noted that the victim's symptoms included: "appetite and sleep disturbance, irritability, having hyperarousal and having difficulty sleeping because he was so scared and aroused. Having flashbacks of the abuse and all of those symptoms taken together could be consistent with post-traumatic stress and with depression." The victim told Dr. Livingston that he had had "thoughts of suicide at one time."

[4] The following colloquy took place between the prosecutor and Ware:

"Q. Now, did the defendant invoke his right to speak with an attorney at any time during the interview?

"A. Yeah. Sometime in the middle of the interview.

"Q. And when he invoked his right to speak with an attorney, what occurred?

"A. The interview stopped.

"Q. And did the—at any time did the defendant invoke his right to remain silent during the interview?

"A. No.

"Q. And did the defendant agree to answer your questions without any attorney being present up until the point he invoked his right to speak with an attorney?

"A. Yes.

"Q. And did you promise the defendant anything in return for making his statement?

"A. No.

"Q. And did you coerce the defendant in any way into making his statement with threat or action?

"A. No, ma'am.

"Q. And to the best of your knowledge was the defendant's statement freely and voluntarily given?

"A. Yes, ma'am.

"Q. But did the defendant ever ask to stop the questioning?

"A. No.

"Q. I thought you stated earlier—

"A. I'm sorry.

"Q. —he did stop at some point?

"A. Yes. He did stop at some point. I'm sorry.

"Q. And when he stopped questioning what occurred?

"A. The interview stopped.

"Q. Was he free to leave at that point?

"A. Yes.

"Q. And did he leave?

"A. Yes.

"Q. Did the defendant make a statement in response to each and every one of your questions up and to the point he stopped the interview?

"A. Yes, ma'am.

"Q. And did you have the defendant sign a waiver of rights form prior to your interview with him?

"A. Yes."

[5] The following colloquy took place between the prosecutor and Ware:

"Q. Now, at the beginning of your interview with the defendant, what did you personally observe his demeanor to be?

"A. Very cooperative.

"Q. Does—did his demeanor remain cooperative throughout the interview?

"A. No, ma'am.

"Q. When did it change?

"A. When I asked him the allegations of what he did to [the victim].

"Q. And how did you personally observe his demeanor to change?

"A. He became standoffish, a pause in his questions.

"Q. Now, at any time during your discussion with the defendant, did the defendant ever claim that the victim was lying about the allegations against him or making these allegations up?

"A. No, ma'am."

[6] The following colloquy took place between defense counsel and Ware:

"Q. Is it fair to say that even though the interview was cut short that [the defendant] indicated in a broad spectrum that nothing, no incidents of a sexual nature ever occurred between him and [the victim]?

"A. Sir, he had a chance to explain it, sir.

"Q. Excuse me?

"A. He had a chance to explain, sir.

"Q. Oh, I understand, but that wasn't my question. Was there ever any representation, statement by [the defendant] that—no, nothing ever occurred between [the victim] and [the defendant]?

"A. You're right, sir, he didn't say that?

"Q. What?

"A. He didn't say that, sir.

"Q. What did he say? In other words, was the question never raised or did he say no, like, nothing ever happened, but you would have like[d] to continue this interview, I understand—

"A. Yes.

"Q. —is that a fair statement?

"A. Yes, sir.

"Q. Sure. Okay. But in the interview, it came to a point where at least [the defendant] knew why he was there?

"A. Yes, sir.

"Q. Right. Okay. And in a broader sense not—you would have like[d] to go on and have more questions, but it's fair to say he never admitted that anything occurred between anything of a sexual nature ever occurred between [the defendant] and [the victim]; is that correct?

"A. Yes, sir.

"Q. In the broadest of your questions, did you ever—did he ever in a sense deny in a broad sense nothing, nothing ever happened?

"A. No, sir.

"Q. Never—never—is it fair to say that [the defendant's] demeanor from your perspective or it's a rather long interview, would you describe as appearing as you perceived him in watching it again today from your perspective was he at least up until the point where it was stopped was he chatty, nervous, defiant; how would you describe him in that interview?

"A. Up until that point, sir, he was very cooperative.

"Q. Cooperative?

"A. Yes, sir.

"Q. I have no additional questions. Thank you."

[7] The following colloquy took place between the prosecutor and Boland:

"Q. Did the defendant answer all of the questions posed to him by Detective Ware that day?

"A. Mostly.

"Q. And then what occurred?

"A. Towards the end he decided he wasn't going to answer any more questions.

"Q. And officer, at any time during the interview in which you were present, did the defendant ever claim that the victim was lying about the allegations against him or making these allegations up?

"A. No, he did not."

[8] The following colloquy took place between defense counsel and Boland:

"Q. All right. Were any of the questions essentially did you have any sexual activity with [the victim]? [Were] any of the questions essentially . . . that question?

"A. We never got to that point.

"Q. Did [the defendant] deny that he had any sexual activity with [the victim]?

"A. No, he did not.

"Q. And so he—what were the essential questions that you asked him before the interview terminated?

"A. Most of the questions we wanted to know what the relationship was as to, you know, how they interacted with each other. The relationship with [the victim's mother] and that sort of stuff. He shut down when we started posing more direct questions.

"Q. But is it fair to say that he never stated that there was any inappropriate activity between [the victim] and himself?

"A. We never got to that point.

"Q. Never got to that point. And he never was casting dispersions on [the victim] that he's a liar or anything like that?

"A. No, he did not.

"Q. Is it fair to say the interview got to a certain point and then it ended?

"A. He ended it, yes.

"Q. I have no additional questions."

[9] The following colloquy took place between the prosecutor and Winiger:

"Q. Now, did the defendant invoke his right to speak with an attorney at any time during the interview?

"A. Right at the end of the interview.

"Q. And did the defendant invoke his right to remain silent at any time during the interview?

"A. He stated to me this interview was over.

"Q. Did the defendant agree to answer your questions without an attorney and without the presence of an attorney until the point that he stated he wanted the interview to end?

"A. Oh, yes, ma'am, he did.

"Q. And did you promise the defendant anything in return for making his statement?

"A. No.

"Q. And did you coerce the defendant in any way to make his statement under threat or promise?

"A. No, ma'am.

"Q. To your best of your knowledge was the defendant's statement freely

and voluntarily given?

"A. Yes.

"Q. Now, at some point did the defendant stop the questioning?

"A. Yes, he did.

"Q. And what did he say?

"A. When I brought out what the allegation was against him he told me that I was trying to trick him just like the Hartford police had done and he said this interview is over.

"Q. And when he said this interview is over what occurred?

"A. I got up from my chair, I opened the door, I escorted him to the front lobby, I opened the door for him, I watched him get in the car that he came in and he left.

"Q. But when he was answering questions, did the defendant make a statement in response to each one of your questions?

"A. Yes, he did.

"Q. And did you have the defendant sign a waiver of rights form prior to your interview with him?

"A. I did."

[10] The following colloquy took place between the prosecutor and Winiger:

"Q. Did you tell the defendant that [the victim] had also been diagnosed with a sexually transmitted disease?

"A. Not til after he had made that admission.

"Q. Okay. And after you notified him of that what was his response to hearing that [the victim] had been diagnosed with a sexually transmitted disease?

"A. That's when the interview stopped. That's when he said that I was trying to trick him just like the Hartford cops did and he said the interview was over and he got up and that was the end of it.

"Q. Now, did you make the defendant aware of the allegations against him by [the victim]?

"A. Yes, I did.

"Q. And what did you tell the defendant those allegations were?

"A. I told him that he had made the allegation that he had sexually abused the boy.

"Q. Okay. And what was the defendant's physical response to your informing him that he had been alleged of sexual abuse of [the victim]?

"A. That was when we went back to when I brought up the first initial explanation of when he had that kind of defeated let the air out type of thing rounded his shoulders.

"Q. Now, at the completion of your discussion with the defendant, did you give the defendant the opportunity to give a signed, sworn, written statement?

"A. As I was interviewing him I had been typing a statement on the computer in the interview room, but when he said that we were done that was it, so I wasn't able to get him to, you know, give a statement or sign anything or to make anything official.

"Q. Now, at any time during your discussions with the defendant, did the defendant ever claim that the victim was lying about the allegations against him or making these allegations up?

"A. No, ma'am, I don't recall that."

[11] The defendant does not claim that the state violated *Doyle* by introducing the two signed waiver of rights forms into evidence. In his reply brief, the defendant, discussing the waiver forms, states "[o]nce again, it is not the initial waiver by [the] defendant which violates *Doyle*, but the subsequent exercise of his constitutional right to terminate the interview."

[12] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) *State v. Golding*, supra, 213 Conn. 239–40, as modified by *In re Yasiel R.*, supra, 317 Conn. 781.

[13] The state argues that it "properly proffered [the challenged] evidence to explain the course of the police investigations and, therefore, did not violate *Doyle*." Our Supreme Court has recognized that "[r]eferences to one's invocation of the right to remain silent [are] not always constitutionally

impermissible . . . [and are] allowed . . . in certain limited and exceptional circumstances. . . . Specifically, the state is permitted some leeway in adducing evidence of the defendant's assertion of that right for purposes of demonstrating the investigative effort made by the police and the sequence of events as they unfolded . . . as long as the evidence is not offered to impeach the testimony of the defendant in any way." (Citation omitted; internal quotation marks omitted.) *State* v. *Lockhart*, supra, 298 Conn. 581–82.

The state further argues that "[a]lthough the defendant refers to his statements that he had to 'stop' the interview as evidence of his invocation of this right to remain silent . . . these comments instead show his vacillation about participating in the interview," and claims that "*Doyle* and its progeny do not protect a defendant's 'selective silence.' " (Citation omitted; emphasis omitted.) See *State* v. *Ramos*, supra, 178 Conn. App. 409.

Because we conclude that any claimed error was harmless beyond a reasonable doubt, we need not reach whether introduction of the challenged evidence was permissible to demonstrate investigative efforts or because the defendant remained "selectively silent."

[14] "Although a finding of harmless error in a situation where the state improperly comments upon the defendant's postarrest silence is the exception to the rule, we find that the present case fits the exception rather than the rule." (Internal quotation marks omitted.) *State* v. *Williams*, 27 Conn. App. 654, 662, 610 A.2d 672, cert. denied, 223 Conn. 914, 614 A.2d 829 (1992).

[15] In addition to our conclusion that the admission of the challenged evidence was harmless beyond a reasonable doubt, we also conclude that the defendant waived his *Doyle* claim as to the evidence depicted in the video.

"A defendant in a criminal prosecution may waive one or more of his or her fundamental rights. . . . In the usual *Golding* situation, the defendant raises a claim on appeal which, while not preserved at trial, at least was not waived at trial." (Internal quotation marks omitted.) *State* v. *Hudson*, 122 Conn. App. 804, 813, 998 A.2d 1272, cert. denied, 298 Conn. 922, 4 A.3d 1229 (2010). "[A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . . To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 448–49, 988 A.2d 167 (2009).

"[W]aiver is [t]he voluntary relinquishment or abandonment—express or implied—of a legal right or notice. . . . In determining waiver, the conduct of the parties is of great importance. . . . [W]aiver may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. . . . Thus, [w]aiver . . . involves the idea of assent, and assent is an act of understanding." (Internal quotation marks omitted.) *State* v. *Cancel*, 149 Conn. App. 86, 100, 87 A.3d 618, cert. denied, 311 Conn. 954, 97 A.3d 985 (2014).

The state relies on *State* v. *Boyd*, 295 Conn. 707, 750 n.26, 992 A.2d 1071 (2010), cert. denied, 562 U.S. 1224, 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011), in support of its argument that the defendant waived his *Doyle* claim by his counsel's representation at trial that he did not object to the introduction of the video. In *Boyd*, a detective testified as to the defendant waiving his *Miranda* rights and talking with the police. "Interspersed among . . . exculpatory statements," the defendant had also stated that he was not ready to "tell the police everything that he knew about the murder and that he was not willing to discuss the crime scene." Id., 750. In a footnote, our Supreme Court stated: "Defense counsel expressly stated that she did not object to [the detective's] testimony that, after the defendant told [the detective] that his question whether the defendant had been in Norwalk with the victim on the night of the murder was a very good one, the defendant stated that he was not going to discuss the crime scene. The defendant's objection to that testimony was, therefore, waived." Id., 750 n.26; see also *State* v. *Cancel*, supra, 149 Conn. App. 101 (defendant waived fourteenth amendment due process claim regarding joinder where, inter alia, defense counsel "expressly stated that there was no objection to the motion"); *State* v. *Hudson*, supra, 122 Conn. App. 814 (confrontation claim was waived, when, "at trial, defense counsel affirmatively assented to the playback of certain testimony without requesting the playback of additional testimony and with-

out asking for the cautionary instruction that he now, on appeal, argues was constitutionally required").

The record in the present case demonstrates that defense counsel not only assented to the introduction of the video but also referenced the video in his cross-examination and further failed to object when the video was replayed at the jury's request during deliberations. As noted previously, at the time of the introduction of the video, defense counsel expressly stated: "[n]o objection, Your Honor." During his cross-examination of Ware, defense counsel referred to the video, asking "is it fair to say that [the defendant's] demeanor from your perspective . . . would you describe as appearing as you perceived him *in watching it again today* from your perspective was he at least up until the point where it was stopped was he chatty, nervous, defiant, how would you describe him in that interview?" (Emphasis added.) Moreover, during deliberations when the jury requested to rewatch a portion of the video and to review the testimony of the victim, defense counsel responded to the request by inquiring as to "logistics" and tried to recall his "own timeline" regarding how long the two reviews would take. He made no objection to the jury rewatching the video. We thus conclude that because the defendant has waived his claim with respect to the video, there is no existing constitutional violation, and thus the claim that the admission of the video into evidence violated *Doyle* fails to satisfy the third prong of *Golding.*

[16] In her statement, she noted that in April or May, 2013, when the victim first told her about the abuse but then denied it, she "left it at that but [she] still had [her] doubts because he said it too many times." She further stated that the victim "does fabricate things but this time it didn't seem so."

[17] The defendant claims that "[i]f the jury wanted to rehear the taped interview of this defendant by the police, including his exercise of his right to remain silent, it is proof that a *Doyle* violation was not insignificant, at least in the minds of the jury." We first note that the defendant incorrectly claims that "the only piece of evidence the jury wanted to hear was the taped interview . . . ." The record reveals that the jury also asked to review the testimony of the victim. The defendant concedes that he "did make some damaging admissions" during the Hartford interview and recognizes that he "admitted he was alone with [the victim] and to taking him to some of the places where [the victim] claims to have been sexually assaulted . . . ." Accordingly, we reject the defendant's claim that the jury's request to rewatch the video compels the conclusion that the jury found the challenged portion of the Hartford interview significant, particularly in light of the nonchallenged statements the defendant made during that interview and the relationship between those statements and the defenses presented during trial.

Moreover, defense counsel's failure to object, and affirmative representation that he had no objection, to the introduction of the video shows that defense counsel did not consider the video to be prejudicial. See *State* v. *Canty,* 223 Conn. 703, 712, 613 A.2d 1287 (1992) (noting, in harmless error analysis, that trial counsel's failure to object "indicate[d] that he did not consider" the challenged evidence "to have prejudiced the defendant").

[18] The defendant relies upon *Hill* v. *Turpin,* 135 F.3d 1411, 1415–16 (11th Cir. 1998) for the proposition that "repeated and deliberate" reference to a defendant's silence has a substantial influence on the jury's verdict. In *Hill,* the prosecutor, despite repeated warnings prior to trial that the state was precluded from introducing evidence regarding the defendant's request for counsel: (1) elicited testimony from the chief investigator regarding the defendant's exercise of his rights, (2) used the defendant's silence to impeach his testimony at trial by asking him "[d]id you ever try to explain all of this to anybody before today?" and (3) highlighted during closing argument the defendant's "failure to tell his exculpatory story to the police at the time of his arrest by contrasting [the defendant's] silence with the statements made by other scene witnesses." Id., 1414–15. Having concluded that the prosecutor violated *Doyle,* the United States Court of Appeals for the Eleventh Circuit further determined that the violation was not harmless, citing "the repeated and deliberate nature" of the violations, and "the significant weaknesses in the state's case." Id., 1416–17.

*Hill* is distinguishable in that the prosecutor in the present case neither used the defendant's silence to impeach his testimony nor referenced the defendant's silence in closing argument. Moreover, this is not a case, like *Hill,* where there were "significant weaknesses in the state's case" against the defendant.